Robert LOWE, Plaintiff–Appellant,

v.

CONSOLIDATED FREIGHTWAYS OF DELAWARE, INCORPORATED, Jay Sakwinski, and Bruce Demitros, Defendants–Appellees.

No. 98–2297.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1999.

Decided May 6, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied June 2, 1999.

Thomas G. Halloran (argued), Waukesha, WI, for Plaintiff–Appellant.

Susan R. Maisa (argued), Foley & Lardner, Milwaukee, WI, for Defendants–Appellees.

Before EASTERBROOK, MANION, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In August 1989 Robert Lowe started working for Consolidated Freightways loading and unloading freight in CF''s Milwaukee terminal. According to Lowe, beginning in late 1991 his work environment became racially hostile. Lowe found nooses hanging in his work area, posters about the KKK, and copies of "jokes" demeaning blacks, including one entitled "Leroy's Homework Assignment," which called blacks stupid and made fun of the way they talk. Other employees referred to him as "chocolate boy" and "jungle bunny"; they told racial jokes and one supervisor even said that he "never would have hired [Lowe's] black ass in the first place." For the most part, when he found something offensive, Lowe reported it to a supervisor or a union steward. But nothing changed, and in October 1994 Lowe filed a discrimination charge with the EEOC.

It didn't help. Even after Lowe filed his charge he continued to find nooses around the terminal. He also found more "jokes," including the "Ebonics Lesson," which, like "Leroy's Homework Assignment," called blacks stupid and made fun of the way they talk, and the "mud flap poster," a want-ad parody seeking small black appli-

cants to act as mud flaps. Another employee pulled a gun on Lowe, and Jay Sakwinski, the office manager at the Milwaukee terminal, told Lowe that he was going to "get him," that he would "fuck him in his black ass until he bleeds." Lowe filed a retaliation charge with the EEOC in May 1995.

After exhausting his administrative remedies Lowe turned to the federal courts. He sued, alleging that CF subjected him to a racially hostile work environment and then retaliated against him for complaining about it. The case was tried to a jury, which returned a verdict for CF. CF's theory, which the jury apparently bought, was that Lowe fabricated the entire story to get cash. Between them, the parties called at least 27 witnesses; the trial lasted 7 days. After the jury returned its verdict, Lowe moved for a new trial, arguing that the verdict was against the weight of the evidence. The district court denied Lowe's motion and he appeals.

■ Lowe bears a particularly heavy burden in convincing us that the district court should have granted a new trial:

> A motion for a new trial based on the sufficiency of the evidence should be granted only if the verdict is against the manifest weight of the evidence. *See Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir.1989). Our review of a district court's application of this test is deferential. *See American Nat'l Bank & Trust Co.*, 125 F.3d at 431. We shall reverse a district court's denial of a motion for a new trial only upon a showing that the court abused its discretion. *See id.*

*Riemer v. Illinois Dept. of Transp.*, 148 F.3d 800, 806 (7th Cir.1998). The district court did not abuse its discretion when it declined to upset the jury's verdict here.

■ After reading the facts recited above, one might well wonder how a jury could have returned the verdict it did. Lowe tells a horrendous story. But there are two very different sides to this story.

CF presented a much rosier picture of the work environment, calling several witnesses (some black; some white) who testified they did not find the environment to be hostile. CF also presented substantial evidence from which the jury could have concluded that Lowe was lying through his teeth when he gave his testimony. CF attacked Lowe's credibility and shot holes in his testimony. Even the dry trial transcript shows that CF's counsel worked Lowe over pretty well. For example, CF got Lowe to admit that he had previously lied to the unemployment compensation department, filing claims for unemployment even after he started working—and collecting wages—at CF; Lowe filed false claims every week for 2 or 3 months. He admitted he did it and he admitted he was lying when he did it. The obvious inference was that if he'd lie to collect piddly unemployment compensation, he'd surely lie to score a jackpot with a big jury verdict in a civil rights case.

And there was more damning testimony. CF tripped Lowe up on his story about what he saw in the Milwaukee terminal. Lowe alleged that he had seen numerous (at least 8 or 10) nooses in the workplace before he filed his discrimination charge. Yet the documentary evidence showed that there had been only one noose sighting. Lowe's first EEOC charge alleged only one noose sighting, and Lowe's own notes, which he kept from 1992 to 1996 to document the workplace hostility, reflected only one noose sighting. CF also offered witnesses who testified that the noose wasn't racially motivated; rather, it was union propaganda slamming scabs. And CF raised the question of why Lowe didn't have more proof of the nooses. Lowe introduced two nooses at trial—one actual noose and a picture of another one which he had taken using a camera kept in the terminal to record damaged freight. Lowe admitted that, although he had seen other nooses, he didn't take them because "I couldn't put that noose in my pocket and get out of there with that noose like that."

Nor did he take any other pictures, though the camera was always available, because he thought his supervisors would be watching him after he filed his EEOC charge. The jury was free to accept his explanations or not. It apparently did not accept them.

Lowe's notes provided still more ammunition for impeachment. According to Lowe, he kept the notes to build a sort of evidentiary arsenal to support his harassment claim. Yet the notes make no mention of most of the harassment he testified to at trial; the notes don't mention "Leroy's Homework Assignment," the "Ebonics Lesson," or the mud flap poster. When asked to explain that, he said he recorded "things that [were] worse than other things." He also said he lost a lot of his notes—explanations the jury was free to believe or not.

Lowe testified that he had seen copies of "Leroy's Homework Assignment" and the "Ebonics Lesson" in the terminal. At trial he testified he saw the Homework Assignment on the loading dock. But at his deposition, Lowe admitted that he saw "Leroy's Homework Assignment" only because Jimmy Johnson, a co-worker and friend, gave it to him to add to his evidentiary arsenal. Lowe admitted that he did not think Johnson's giving him the document was racial harassment. The jury was left to decide whether Lowe was telling the truth at his deposition or at trial.

CF also put on witnesses to refute Lowe's allegations that another employee pulled a gun on him and that Sakwinski made racist comments to him. Gary Goetz, the employee who allegedly pulled a gun on Lowe, denied that he had done this. Goetz admitted that he brought a gun to work once because another employee was interested in buying it from him and that he was showing the gun to a group of guys at the trunk of his car. He further testified that he thought Lowe walked by when he was showing the gun to the other guys.

Even Lowe had a hard time substantiating this gun incident at trial. He testified that he found the incident threatening but couldn't say that it was racially hostile. He also testified that he reported the incident, but when pressed on that he admitted that he merely asked the potential buyer of the gun whether he had completed the sale. He also testified at his deposition that he hadn't told anyone about the incident.

Lowe testified that Sakwinski, the terminal manager, told him he was going to "get him" and that he'd "fuck him in his black ass until he bleeds." Sakwinski denied saying anything like this. In fact, Sakwinski testified that he and Lowe had a good relationship, and Lowe didn't disagree with that characterization. The jury was free to believe Lowe or to believe Sakwinski; it apparently chose to believe Sakwinski. This might have tipped the scales in Sakwinski's favor: Lowe didn't mention the incident in his notes; nor did he report it to anyone.

Finally, CF challenged Lowe's assertion that he reported incidents to management. Lowe testified at trial that he told supervisors about many of the undocumented offensive incidents. In some cases, his trial testimony directly contradicted his deposition testimony, and CF impeached him on those matters in front of the jury. In at least two instances he testified that he told supervisors about incidents when that was simply impossible because those supervisors were either no longer working at CF or were dead at the time.

In short, CF gave the jury substantial evidence to support a verdict in its favor. And for much of his case, Lowe had nothing but his own testimony to support his claim. Faced with Lowe's record, the many, many inconsistencies in his story, and the testimony of many, many witnesses directly contradicting Lowe's evidence, the jury chose to believe CF's theory and to reject Lowe's story.[1] That was

---

**1.** At oral argument Lowe's counsel tried to

persuade us that the jury did not need to

the jury's prerogative. It's the jury's job—not the district court's job or the job of a panel of appellate judges—to figure out who's telling the truth. The fact that Lowe presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed. *See Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir.1999) ("It is the jury's job to weigh the evidence, not ours.") (quoting *Knox v. State of Indiana*, 93 F.3d 1327, 1337 (7th Cir.1996)). Nor should the verdict be reversed because Lowe explained some of the deficiencies in his presentation. The jury was there; it weighed the witnesses' credibility, considered the evidence, and reached a supportable conclusion. We, like the district court, defer to that conclusion. *See Riemer*, 148 F.3d at 806 ("[W]e 'are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility of the evidence for that of both the jury (in its verdict) and the judge (in not interfering with the verdict).' ") (Citations omitted.) *See also Sheehan*, 173 F.3d at 1047 ("[T]he jury was presented with two radically different stories . . . [and, although it] might rationally have believed [the employer], . . . it did believe [the employee]"; because there was a "reasonable basis in the record for [the] verdict . . . [we] let the verdict stand."). The district court's decision to deny Mr. Lowe's motion for new trial is affirmed.

believe Lowe to find in his favor. We disagree. Most of Lowe's evidence came from his own mouth. Though he had copies of "Leroy's Homework Assignment," the "Ebonics Lesson," and the mud flap poster, and a noose and a picture of a noose, the jury still had to accept his testimony that he found those documents in the workplace.