**Karen SAVINO, Plaintiff–Appellant,**

v.

**C.P. HALL COMPANY, Defendant–Appellee.**

No. 98–4257.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1999.

Decided Dec. 14, 1999.

Ernest T. Rossiello (argued), Rossiello & Associates, Chicago, IL, for Plaintiff–Appellant.

Patricia J. Hill (argued), Jacksonville, FL, for Defendant–Appellee.

Before FLAUM, MANION, and DIANE P. WOOD, Circuit Judges.

MANION, Circuit Judge.

Karen Savino worked under the supervision of William Popper as a part-time clerk for the C.P. Hall Company. In this suit, she alleges that Popper sexually harassed her and that he and C.P. Hall retaliated against her for complaining about the harassment. The district court granted summary judgment for C.P. Hall on Savino's retaliation claim, but permitted the sexual harassment claim to proceed to trial. The jury found for C.P. Hall and awarded Savino nothing. She appeals, arguing that the verdict was not supported by the evidence and that the district court erred in instructing the jury on the *Faragher/Ellerth* affirmative defense. Finding no error, we affirm.

## I.

On April 1, 1995, Savino began working for C.P. Hall as a part-time maintenance clerk at its plant in Bedford Park, Illinois. C.P. Hall manufactures and distributes various ester and polyester chemical products. Savino worked twenty hours per week and her duties included filling out work and purchase orders, checking invoices, maintaining expense reports, and performing other administrative paperwork. She was paid hourly and received no benefits when first hired. William Popper was the plant engineer for the maintenance department and was Savino's supervisor. Their respective desks were in the same office and were adjacent to each other. Shortly after Savino began working for C.P. Hall, Popper purportedly harassed her by making crude remarks about genitalia, breasts, and sex. He stared at her while smiling and occasionally followed her around the workplace. He allegedly attempted to give her neck rubs, pretended to pour coffee down her shirt, read a pornographic magazine in her presence, twice called her at home to invite her to baseball games, and once told her that he drove by her house on the way to a meeting. On one occasion, after Savino declined Popper's dinner invitations, he allegedly held up his hand so that Savino could not exit the room.

After Savino rebuffed Popper's advances, he purportedly tried to discredit her work, ripped up her time card, made snide remarks, and didn't allow her to turn on the air conditioner. Savino also alleged that Popper closely monitored her work breaks to ensure that she did not exceed the time allotted. On July 26, 1995, Savino finally complained to Popper's supervisor, Leslie Mullin. After listening to Savino and taking notes of her complaints, Mullin contacted the corporate director of human resources at C.P. Hall's Chicago office. Mullin then examined with Savino a copy of the company's sexual harassment policy and stated that, if her allegations were true, Popper's actions were inconsistent with the conduct required of employees under the policy. Within a week of Savino's complaint, James Roach and Cindy Green of the human resources department came to Bedford Park to investigate Savino's allegations. Roach and Green met with Savino, listened to her story, and instructed her that if Popper continued to bother her she should promptly inform them so that they could further address the situation. Savino agreed that a stern warning would solve the problem and that she could comfortably continue working for Popper.[1]

Mullin and Roach then confronted Popper with the accusations. Popper acted surprised and denied that he had harassed

---

1. Savino testified at trial that while she told Roach she wouldn't mind continuing under Popper's supervision, she really didn't want to do so.

Savino or done anything improper. Importantly, C.P. Hall was unable to corroborate Savino's account of the events. Nevertheless, Mullin reprimanded Popper, instructed him to act professionally around Savino, warned him about doing anything that might appear retaliatory, and told him that any further problems could result in his termination. Mullin testified that he thought a reprimand was sufficient punishment because Popper had an exemplary work record, had never been accused of sexual harassment before, and because Savino said that "she did not want Bill to get in any trouble." Roach testified that he considered the reprimand appropriate because Savino's charges could not be substantiated. Still, to prevent any further allegations, within a week of her complaints C.P. Hall also moved Savino away from Popper to an office cubicle in the accounting department on another floor.

In October 1995, C.P. Hall increased Savino's hours by five per week (to twenty-five), and continued to pay her $8 per hour.[2] This increase in hours enabled her to receive full benefits, which entailed medical, dental, and life insurance, long- and short-term disability, and the ability to participate in the company's 401(k) plan. Award of these benefits cost C.P. Hall an additional $3.50 per hour. Later, when Savino inquired about getting a pay increase, Green told her that C.P. Hall provided these benefits to part-time workers in lieu of raises. Naturally, Savino still hoped to get more money and a full-time position with the company.

Mullin testified at trial that he was unaware of Savino having further problems with Popper until about April 9, 1996, when she complained that another employee overheard Popper, around December 1995, refer to her as a "bitch" or "whore," although Savino herself never heard Popper make these comments. She also alleged that Popper had stared at her, refused to give her gift certificates (worth between $10 and $25) that the company periodically gave employees, and unjustifiably criticized her work. Mullin again called human resources personnel and within a week discussed Savino's latest complaint with Popper. Roach and Green also made another appearance at the plant and conducted a full investigation. Around this time, Savino came to Mullin's office asking about an anniversary pay raise. Mullin informed Savino that her receipt of full benefits was her raise and that no other raise would be immediately forthcoming. That same day, April 25, Savino filed a charge with the Illinois Department of Human Rights, alleging sexual harassment and retaliation. On April 26, 1996, Roach again traveled to Bedford Park to discuss the incidents with Savino, but she refused to speak with him. Around May 10, 1996, when Popper admitted to Roach that he once used a derogatory term in reference to Savino (but not in her presence), C.P. Hall disciplined him by suspending him without pay for one week, which penalized him almost $2,000. He was also instructed to keep his contact with Savino to a minimum and to continue to communicate with her only through interoffice mail.

On June 13, 1996, Savino brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)–2(a)(1),[3] alleging quid pro quo and hostile environment sexual harassment and retaliation.[4]

---

**2.** Her pay was increased to $8.50 per hour in April or May 1996.

**3.** Title VII prohibits employers from discriminating against employees on the basis of sex with respect to compensation, terms, conditions, or privileges of employment. This prohibition extends to conduct which is so severe or pervasive as to alter the terms and conditions of employment and which creates an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

**4.** Savino continued her employment with C.P. Hall even after filing her suit. She remained with the company until November 29, 1996, when she voluntarily left to take a position elsewhere.

The retaliation complaint stemmed from C.P. Hall's failure to give Savino two positions in the accounting department and a raise. C.P. Hall moved for summary judgment on all claims. Construing the facts in the light most favorable to Savino, the district court found that Savino merited a trial on her sexual harassment claim, but that summary judgment was proper on her retaliation claim.[5] *See Savino v. The C.P. Hall Co.*, 988 F.Supp. 1171 (N.D.Ill.1997).

The trial commenced on September 21, 1998. The jury heard testimony from Savino, Popper, Roach, Mullin, Green, and some co-employees. Savino recounted her allegations that Popper harassed her, and one employee confirmed that they heard Popper refer to Savino as a "bitch" and a "whore" (although not in Savino's presence). When Popper took the stand, he denied that he had ever harassed Savino, but admitted that he once referred to her as a whore. He also discussed Savino's allegations and gave a significantly different version of the events than Savino. For example, with respect to the telephone calls to Savino, he recalled that one of the calls was to inform Savino that she forgot her check at the office, and the other was to tell her that the baseball game to which she was going to take her daughter was canceled due to rain. The testimony from Roach and Mullin indicated that Savino's charges may have been motivated by a desire to get a transfer to the accounting department and to obtain a raise and a better position. After hearing this testimony, the jury found for C.P. Hall. Savino then moved to set aside the verdict, for judgment as a matter of law as to liability, or in the alternative for a new trial on liability and damages. The district court

denied these motions and let the verdict stand. Savino appeals.

## II.

### A. *Faragher/Ellerth* Jury Instruction

#### 1. Did the evidence merit giving the instruction?

Savino first argues that the district court erred in instructing the jury concerning an employer's affirmative defense under *Faragher* and *Ellerth* to a claim of hostile environment sexual harassment perpetrated by a supervisor. Although she proposed a version of this instruction herself, she nevertheless argues that the evidence adduced at trial did not warrant the instruction.

A party who wants to challenge the propriety of submitting a given claim or defense to the jury is obliged to make a motion under Fed.R.Civ.P. 50(a) at some time prior to the submission of the case to the jury. Failure to make such a motion waives the sufficiency of the evidence point on appeal. *See EEOC v. AIC Security, Ltd.*, 55 F.3d 1276, 1286 (7th Cir.1995). If a party could avoid the necessity of a Rule 50 motion simply by attacking the judge's decision to give certain jury instructions, the clarity achieved by the Rule 50 process would be compromised and little would be left of the general rule.[6] Savino has effectively argued for a regime under which a Rule 50 motion seeking partial judgment as a matter of law on the affirmative defense created by *Ellerth* and *Faragher* should be equated to a Rule 51 objection to the giving or failure to give an instruction. We decline to take that step, and instead find that Savino has waived her sufficiency argument in this case.

---

**5.** Savino mentions her retaliation claim in the "Issues Presented for Review" section of her appellate brief. However, she does not address this issue in the body of her brief. Therefore, any argument on this claim is waived. *See United States v. Watson*, 189 F.3d 496, 500 (7th Cir.1999).

**6.** Savino's counsel was asked at oral argument why he did not move for a judgment as a matter of law as to the affirmative defense, for if Savino prevailed on this motion, the jury would never have been instructed on this defense. Counsel responded that in his experience "it is sort of a waste for a plaintiff to make a motion for a judgment as a matter of law, quite frankly."

▮ But even if Savino's decision to forego a Rule 50 motion did not control this case, we could not say that the district court erred in instructing the jury as it did. In this case, the propriety of the instruction turns on the elements C.P. Hall had to establish to support the *Faragher/Ellerth* affirmative defense. In *Burlington Industries, Inc. v. Ellerth* and *Faragher v. City of Boca Raton*, the Supreme Court established that under Title VII, employers are vicariously liable for hostile environment sexual harassment perpetrated by the victim's supervisor. 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998); 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998).[7] Where the plaintiff suffered no tangible employment action, however, the employer is entitled to establish by a preponderance of the evidence an affirmative defense consisting of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 118 S.Ct. at 2270; *Faragher*, 118 S.Ct. at 2293. In explaining this defense, the Supreme Court stated:

> While proof that an employer had promulgated an anti-harassment policy with complaint procedures is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Ellerth*, 118 S.Ct. at 2270; *Faragher*, 118 S.Ct. at 2293. Thus, to merit an instruction on the *Faragher/Ellerth* affirmative defense the employer must show that: (1) the plaintiff endured no tangible employment action; (2) there is some evidence that the employer reasonably attempted to correct and prevent sexual harassment; and (3) there is some evidence that the employee unreasonably failed to utilize the avenues presented to prevent or correct the harassment.

▮ In the present case, C.P. Hall satisfied the first criterion, as Savino suffered no tangible employment action.[8] As to her employer's reasonable efforts to prevent or correct harassment, the evidence indicated that C.P. Hall had a sexual

7. There is no question that Popper was Savino's supervisor, as he hired her and apparently had the power to terminate her position. *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir.1998) (a supervisor is one who can hire, fire, demote, promote, transfer, or discipline the plaintiff).

8. Savino obliquely argues that her transfer to another office away from Popper was a tangible employment action. It wasn't. A tangible employment action has to cause a substantial detriment to the plaintiff's employment relationship. As the Supreme Court stated: "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits." *Ellerth*, 118 S.Ct. at 2268 (emphasis added). Thus, a tangible employment action is akin to an adverse employment action, as courts have used the term. *See Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir.1999); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 154 (3d Cir.1999). Savino did not suffer a tangible employment decision because reassignment to a comparable office is neither sufficiently adverse nor significant. *See Halloway v. Milwaukee County*, 180 F.3d 820, 826 (7th Cir.1999); *see also Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996) (moving an employee "from a spacious, brightly lit office to a dingy closet" could constitute an adverse employment action); *Collins v. State of Illinois*, 830 F.2d 692, 704 (7th Cir.1987) (holding that the plaintiff suffered an adverse employment action when she was deprived of her office, telephone, business cards, and title).

harassment policy posted, and this policy included instructions for reporting harassment. Moreover, Savino's own testimony indicated that when she finally made her complaint after several months of alleged harassment, C.P. Hall promptly investigated her charges and sought to remedy the problem, first by reprimanding Popper and relocating her away from him on another floor, and later by suspending him. This is sufficient evidence to satisfy the second criterion.

■■■ With respect to the third criterion, the employee's failure to take advantage of opportunities to prevent or correct the harassment, Savino's own testimony indicated that she didn't complain about the harassment to anyone other than Popper for around four months. When she did report it, she did not tell her employer about incidents that had apparently already occurred. She first raised them much later during her deposition. Furthermore, after her first complaint, she was instructed to call Green, Mullin, or Roach immediately in the event that Popper engaged in similar activity. But Savino made no complaints until July 1996, and even then her main complaint was about a statement overheard by another employee in December 1995. This evidence was sufficient to satisfy the third criterion.

■■■ As we understand her, Savino is also arguing that the jury should not have been given the *Ellerth/Faragher* affirmative defense instruction because (a) actionable harassment existed after her July 1995 complaint, and (b) the existence of such harassment precludes an employer as a matter of law from satisfying its burden on the defense. That argument fails here because it is not even clear that actionable harassment continued after the July 1995 complaint. As some courts have noted, the sporadic use of abusive language, gender-related jokes, and occasional teasing are fairly commonplace in some employment settings and "do not amount to actionable harassment." *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151,

1159 (8th Cir.1999); *see Faragher*, 118 S.Ct. at 2283–84. Thus, the fact that a plaintiff merely heard through the grapevine that her supervisor once or twice referred to her in derogatory terms is not actionable sexual harassment. *See Faragher*, 118 S.Ct. at 2283 (offhand comments and isolated incidents do not rise to the level of actionable harassment unless they are particularly egregious); *see also Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 758 (7th Cir.1998) (the impact of second-hand harassment is not as great as harassment directed at the plaintiff). Assuming also that Popper stared at Savino and once failed to give her a $25 gift certificate, Savino's testimony at trial demonstrated that these occurrences were not sufficiently severe or pervasive as to create a hostile environment, especially since Popper had little contact with Savino after she was moved to another office. *See Filipovic v. K & R Express, Sys., Inc.*, 176 F.3d 390, 398 (7th Cir.1999) (Title VII affords protection only against conduct which is sufficiently severe or pervasive that a reasonable person would find it abusive).

■■■ But even if Savino were subjected to harassment after her July 1995 complaint, that fact alone does not preclude the defendant from availing itself of the *Faragher/Ellerth* affirmative defense. Title VII does not require that the employer's responses to a plaintiff's complaints of supervisory sexual harassment successfully prevented subsequent harassment, only that the employer's actions were reasonably likely to check future harassment. *Parkins*, 163 F.3d at 1036; *see Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir.1999). Thus, based on an employer's knowledge at the time it implemented a corrective measure, the employer's response to complaints of harassment "is adequate if it is reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999); *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999) ("An employer

need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct."); *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir.1999) ("An employer is not liable if it takes prompt remedial action which is reasonably calculated to end the harassment once the employer knew or should have know about the harassment."). In the present case, C.P. Hall's preventive measures mentioned above were reasonably calculated to foreclose subsequent harassment. It was, therefore, entitled to a jury instruction on the *Faragher/Ellerth* affirmative defense, regardless of whether the remedial measures ultimately proved unsuccessful.

### 2. Whether the *Faragher/Ellerth* jury instruction was a correct statement of the law.

Savino next argues that the jury instruction concerning the *Faragher/Ellerth* affirmative defense did not accurately state the law, and that her instruction on the defense should have been given.

 We review jury instructions de novo to determine whether they provide fair and accurate summaries of the law. *United States v. Tingle*, 183 F.3d 719, 729 (7th Cir.1999). Recognizing that the formulation of jury instructions is not an exact science, the district court is given substantial discretion with respect to the precise wording of jury instructions, so long as the instruction completely and correctly states the law. *Id.* Notably, the district court is under no obligation to adopt the wording of any of the litigants' proposed instructions. *Russell v. Nat'l R.R. Passenger Corp.*, 189 F.3d 590, 594 (7th Cir.1999). Reversal is warranted on this point only if an instruction misstates the law and this error misguides the jury so much that one party is prejudiced. *Wichmann v. Board of Trustees of S. Ill. Univ.*, 180 F.3d 791, 804 (7th Cir.1999).

The instruction at issue here states:

If you find that the plaintiff, Karen Savino, has established her claim of sexual harassment, then you may consider whether defendant, The C.P. Hall Company, has established an affirmative defense to plaintiff's established case of sexual harassment.

The burden of proof is on the employer, The C.P. Hall Company, to prove this affirmative defense by a preponderance of the evidence in the case by establishing the following elements:

First: that the C.P. Hall Company exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

Second: that the plaintiff, Ms. Savino, unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to prevent harm otherwise.

If you find that the plaintiff has established her claim of sexual harassment by a preponderance of the evidence, and that the defendant has not established its affirmative defense by a preponderance of the evidence, then your verdict should be for the plaintiff.

On the other hand, if you find that the defendant has established its affirmative defense by a preponderance of the evidence, you may eliminate the defendant's liability or, alternatively, reduce the plaintiff's damages from the date you find the affirmative defense was established by the defendant.

[Tr. Trans. Vol. 4, pp. 42–43]

 Savino's complaint with this instruction centers on its second prong, which she correctly identifies as incorporating the "avoidable consequences" doctrine. She argues that under this doctrine a defendant may have its damages reduced, but cannot receive absolution from liability.

 The avoidable consequences doctrine is a principle of tort law that encourages tort victims to act reasonably to reduce the deleterious effects of the

tort, since the victim is usually in the best position to take ameliorative measures. The doctrine (sometimes called the duty to mitigate damages) does this by denying recovery for the losses which are shown to have resulted from the plaintiff's failure to use reasonable efforts to avoid or prevent harm. *Bank One, Tex., N.A. v. Taylor,* 970 F.2d 16, 29 (5th Cir.1992); *see Outboard Marine Corp. v. Babcock Indus., Inc.,* 106 F.3d 182, 184 (7th Cir.1997) (noting that the avoidable consequences doctrine corresponds to mitigation of damages in contract law). For example, where a tort victim suffers bodily injuries but fails to seek treatment for these injuries, he may recover only for the harm proximately caused by the tortfeasor, and not the aggravation of the initial injuries engendered by his failure to obtain medical attention. *See Lawson v. Trowbridge,* 153 F.3d 368, 377 (7th Cir.1998).

As applied in employment discrimination cases, the Supreme Court has specifically stated that a plaintiff's reticence could be sufficiently serious as to completely preclude an employer's liability, regardless of whether the avoidable consequences doctrine operates differently in tort law. "If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." *Faragher,* 118 S.Ct. at 2292. Accordingly, unreasonable foot-dragging will result in at least a partial reduction of damages, and may completely foreclose liability. Savino's argument to the contrary is without merit.

### B. Sufficiency of the Evidence

 Finally, Savino argues that the jury's verdict was not supported by the evidence adduced at trial.

 A new trial based on insufficient evidence should be granted only if the verdict is against the manifest weight of the evidence. *Lowe v. Consolidated Freightways of Del., Inc.,* 177 F.3d 640, 641 (7th Cir.1999). We review the district court's application of this test deferentially. *Id.* We will reverse a district court's denial of a motion for a new trial only upon a showing that the court abused its discretion. *Id.* In assessing the sufficiency of the evidence we will not reweigh the evidence or judge the credibility of witnesses. If there is a reasonable basis in the record for the jury's verdict, it must stand. *Dallis v. Don Cunningham & Assoc.,* 11 F.3d 713, 715 (7th Cir.1993).

At trial, the jury heard Popper's testimony and his denials that he ever harassed Savino. While it also heard Savino's accusations, the jury was free to believe Popper over Savino, and thus there was sufficient evidence upon which it could have based its decision. Notably, the jury could have relied on more than just Popper's denials to support the verdict. It heard Savino admit that her complaints of unjustified criticism of her work may not have been completely accurate, as she sometimes failed to carry out her assigned duties. As to her allegations that Popper drove by her house, she acknowledged that she never saw him drive by her house, but only that Popper once mentioned to her that he passed by on the way to a meeting. Similarly, although she had accused Popper of following her outside of work, Savino conceded that neither she nor anyone else had ever observed him following her.

The jury also heard that Savino's behavior toward Popper was unusual if he were indeed harassing her. For example, one time Savino complained to Popper that some workmen were sexually harassing her by whistling and making cat-calls as she walked through the plant. Popper immediately reprimanded the workers, made one of them apologize, and Savino never complained about them again. Additionally, despite her complaints, she told Roach and Mullin that she was willing to

continue working under Popper's supervision. Other testimony indicated that without being asked, she occasionally would bring in coffee and baked goods for Popper. A jury could decide that such activity is not typical of a victim of sexual harassment.

There were also some indications that Savino's complaints might have been part of a scheme to extort higher wages or a better position from C.P. Hall. Indeed, around the time Savino was complaining of the harassment, she also inquired whether she was going to get a wage increase that month. She also made clear to Mullin that she did not want Popper to be disciplined, but only verbally reprimanded. This theory also finds support in Savino's reticence in accusing Popper and the fact that she filed a charge with the Illinois Department of Human rights the same day Mullin refused to give her a raise. While Savino's testimony at trial certainly varied from Popper's and that of other witnesses, a reviewing court will not second-guess the credibility of the witnesses. The jury could reasonably have believed that Savino significantly embellished her story in order to pressure the company to grant her favorable job actions. Although the jury could have construed the evidence differently, its conclusion was nevertheless plausible given the evidence presented.

But even if we go one step further and assume that the jury believed Savino was harassed, it could have reasonably based its decision on the *Faragher/Ellerth* affirmative defense. As to evidence supporting the first element of the defense, the jury heard that C.P. Hall had a sexual harassment policy, and that it was posted around the plant. The record also shows that when Savino finally complained in July 1995, within one week Mullin, Roach, and Green thoroughly investigated Savino's complaint and undertook preventive measures. Not only was Popper reprimanded and threatened with termination, but Savino was also removed from the "zone of danger," so to speak. Furthermore, Savino's own testimony indicated that these measures greatly reduced Popper's contact with her. Even fully crediting her conclusory assertions that she was harassed even after her July 1995 complaint (which we do only for the sake of the argument), these remedies effectively curbed the harassment and made it much more difficult for Popper to oppress Savino without being observed by others.

As to the second element of the affirmative defense, the jury heard that Savino waited several months before initially reporting the harassment. Furthermore, C.P. Hall showed that even when Savino finally complained in July 1995, she did not inform her superiors about acts of harassment which she later alleged in this suit. For example, Roach testified that until her deposition in this case, Savino never informed the company of the incident when Popper allegedly blocked her exit from her office. Savino's own testimony did not conflict with this view, as she admitted that she may not have earlier alleged that Popper blocked the door or committed some of the other more egregious conduct she later described.

Def. Counsel: You did not tell Ms. Green that Mr. Popper blocked your way out of the office, did you?

Savino: To be honest, I don't recall if I did or not. I'm not sure exactly all what I told Cindy Green. Like I said, there were so many things I was telling her.

Def. Counsel: And you did not tell Ms. Green or Mr. Mullin that Mr. Popper allegedly rubbed your neck, correct?

Savino: I might have. I'm not sure what Cindy Green—like I said, Cindy Green I told a lot of it. I'm not sure if I did or not.

[Tr. Trans. Vol. 2, pp. 66–67] And despite Savino's contention that the harassment never stopped even after she was moved away from Popper, she delayed reporting it for many months.

Thus, considering all of this testimony, the jury had support for its verdict under

several different theories. Perhaps it believed that Savino's testimony was false and that she made up the whole story. Alternatively, the jury may have believed some of her testimony, but thought that Popper's conduct did not rise to the level of actionable harassment or did not merit an award of damages. Finally, it may have thought that Savino was initially harassed, but that the *Faragher/Ellerth* affirmative defense was applicable so as to bar any recovery. It is readily apparent that the evidence supported any of these conclusions, and that throwing out the jury's verdict would require us to impermissibly second-guess the jury.[9] Accordingly, the district court did not abuse its discretion in declining to grant a new trial. For all of these reasons, we affirm.

---

9. Savino also argues that the jury may have discounted Popper's behavior due to its exposure to media coverage of the Clinton–Lewinsky affair. Because this argument is frivolous, we decline to address it.