## In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3701

TONY CERROS,

*Plaintiff-Appellant,*

v.

STEEL TECHNOLOGIES, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:97 CV 103—**Theresa L. Springmann**, *Judge.*

_____

ARGUED MAY 25, 2004—DECIDED FEBRUARY 23, 2005

_____

Before EASTERBROOK, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* This is the second time the district court has granted judgment against Tony Cerros in his hostile work environment claim against his former employer, Steel Technologies, Inc., and for the second time, we have concluded that we must reverse that judgment. In *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040 (7th Cir. 2002) ("*Cerros I*"), we expressed concern that the court's judgment against Cerros might have resulted from a "misunderstanding about the legal threshold for harassment cases," given the court's failure to explain why the "appalling litany of misconduct" documented in its order was insufficient to show a hostile work environment, *id.* at

1046-47. On remand, however, the court did not start from a clean slate. Instead, it incorporated its factual findings from its first order and made additional findings that unfortunately conflict with respect to critical aspects of Cerros's claim. In light of these inconsistent findings, as well as certain problems with the legal analysis reflected in the judgment below and the conduct of Steel's counsel, we remand this case for a new trial.

# I

Our earlier opinion in this case sets forth the basic facts relevant to the present appeal, and so we repeat here only the essential points. We begin, however, with a review of the procedural history of the case. On October 31, 1996, Cerros filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), alleging discrimination and harassment based on his national origin, which he identified as "Hispanic." Cerros received his right-to-sue letter on December 27, 1996, and shortly thereafter he filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, reiterating his allegations that Steel discriminated against him and created a hostile work environment because of his national origin and race.

Following a bench trial, the court issued its first order on January 5, 2001. In this order, the court made extensive findings of fact and concluded that Cerros could not prevail on either his intentional discrimination or his hostile work environment claims. With respect to the latter claim, the court acknowledged that the racist comments and graffiti to which Cerros was subjected "were offensive, unenlightened, and inappropriate" and "caused discomfort." Yet the court deemed them "relatively isolated" and concluded that, "although the misconduct occurred over the course of more than a year, the evidence demonstrate[d]

that the misconduct was neither frequent, nor severe, nor physically threatening or humiliating."

On appeal, we affirmed the court's judgment in favor of Steel on Cerros's discrimination claim, but vacated and remanded the judgment on his hostile work environment claim. *Cerros I*, 288 F.3d at 1048. We began by reviewing the elements of a hostile work environment claim:

> In order to demonstrate harassment that rises to the level of a statutory violation, the plaintiff must prove that "his or her work environment was both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry v. Exp. Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). The plaintiff must then show that the harassment was based on her membership in a protected class; that the conduct was severe or pervasive; and that there is a basis for employer liability. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998).

*Id.* at 1045. "Most of these points," we noted, "are not in dispute." *Id.* There was no doubt that Cerros subjectively believed that he suffered harassment; that any reasonable person would perceive the comments and graffiti as based on his race or ethnicity; and that he "made efforts to use the complaint mechanisms that were available." *Id.* We explained that "[a]t this stage, therefore, the question is only whether the district court committed clear error in concluding that the harassment from which Cerros suffered was not severe or pervasive enough to meet the statutory standard." *Id.* Several aspects of the lower court's analysis troubled us. First, "its ultimate conclusion does not seem to have take into account the underlying facts it found earlier in the opinion." *Id.* at 1046. Second, "we do not know

exactly how often the offensive graffiti and taunts appeared," making an assessment of the pervasiveness of the conduct impossible. *Id.* And finally, "we note[d] that the district court had already found that Cerros was subjected to direct and highly offensive racial epithets by employees and supervisors that referred to him as brown boy, spic, wetback, Julio, and Javier." *Id.* Yet the court "never explained why this appalling litany of misconduct" was "insufficient to show a hostile work environment." *Id.*

On remand, the district court issued a supplemental order on September 2, 2003. It began that order by quoting verbatim both its findings of fact from its January 2001 order and the statement of facts that we provided in *Cerros I.* The court then made "additional findings" based on its review of the record. These findings detailed Steel's harassment training for its employees, the verbal comments made to Cerros, the graffiti in the company restroom, and Cerros's communication with Steel regarding these incidents. The court made clear that these "additional findings" did not supplant its prior findings, which it reproduced in the same order. In a footnote, the court explained: "The Court now incorporates its findings of facts as stated in its January 5, 2001 Memorandum of Decision and Order and as set forth *supra* as well as the additional findings set forth *supra.*"

Based on all of this, the court addressed the issues that we identified in *Cerros I,* beginning with the pervasiveness of the offensive conduct. The court concluded that, as to the frequency of the verbal remarks and the bathroom graffiti, "the Court cannot fix a certain number or frequency with any degree of confidence." The court consequently found that both the comments and the graffiti "actually shown to be race or national origin related [were] isolated." Turning to the severity of the conduct, the court concluded that, "[a]lthough the credible evidence before the Court demonstrates that some 'severe' terms appeared in the

workplace, the Plaintiff has not shown by a preponderance of the evidence that supervisors played any role in the writing or speaking of these more 'severe' terms." On this basis, the court concluded that "although the Plaintiff himself (*i.e.*, subjectively) may have found the environment to be abusive and discomforting, the environment was not objectively offensive or hostile." Finally, the court held that, even if Cerros had shown a hostile work environment, there was no basis for employer liability under *Ellerth* and *Faragher*. It stated that Steel "exercised reasonable care to prevent and correct promptly any harassing behavior" and that Cerros "did not take advantage of any preventative or corrective opportunities provided by the Defendant." Once again, the court entered judgment for Steel. This successive appeal followed.

## II

### A

The primary difficulty with the September 2003 order is that it contains critical factual inconsistencies, as a result of the district court's decision to rely both on the findings from the January 2001 order and the additional findings it made on remand. For example, the court's January 2001 order states that "during 1996 and 1997, supervisors (including Colvin) and other employees occasionally referred to the Plaintiff as brown boy, spic, Julio, and Javier, talked down to him, and said things under their breath." In addition, "[w]hile working on the second shift, the Plaintiff was subjected to national origin related comments and epithets." In its September 2003 order, in contrast, the court discounted Cerros's testimony regarding these incidents, describing it as "remarkably lacking in specificity" and objecting that he had "not shown by a preponderance of the evidence that supervisors played any role in the writing or speaking of these more 'severe' [racial] terms."

The court also found "it significant that the EEOC Affidavit, which the Plaintiff filed with his one and only Charge, did not reference any specific racial remarks made by [supervisors] Colvin [and] Harrington, or [plant manager] Bennett or any specific incidents when such remarks would have been made." Had the court's September 2003 order consisted only of these latter comments, we might have concluded that it had retracted its earlier finding that Cerros was subjected to these utterly unacceptable labels. Because the court explicitly incorporated its prior factual findings into its September 2003 order, however, we cannot avoid the tensions between these dual accounts of Cerros's treatment.

It is also impossible to reconcile the court's two sets of findings with respect to Cerros's efforts to notify Steel of the harassment that he suffered and Steel's response to his complaints. In its January 2001 order, the court stated unequivocally that "[t]he Plaintiff brought the misconduct and some of the incidents to the attention of the Defendant's agents." The court found five specific instances in which Cerros informed his supervisors that he was being harassed: (1) "The Plaintiff confronted Colvin, telling him that he was behaving as a racist, but Colvin denied it." (2) "On September 11, 1996, the Plaintiff informed Colvin, his immediate supervisor, that he believed he was the victim of national-origin harassment." (3) "The Plaintiff told Bennett that he had moved from second to first shift to get away from Colvin because of Colvin's harassing conduct and the national origin epithets." (4) "On another occasion, the Plaintiff told Bennett of the use of epithets such as brown boy, spic, Julio, and Javier, by Colvin and others. However, Bennett chuckled and responded that he could not believe that Colvin would be capable of this. No formal investigation was conducted." (5) "The Plaintiff also told several supervisors, including Beal, Meyers, and Harrington, and Norworul about these incidents, but the epithets continued."

The court's "additional findings" in its September 2003 order directly contradict this account of Cerros's communications with his supervisors. The court flatly stated that "the Plaintiff did not take advantage of any preventative or corrective opportunities provided by the Defendant and did not otherwise avoid harm." According to the court, "[t]he credible evidence in the record shows . . . that the Defendant was not told of race and national origin related slurs or epithets" and "that Bennett, the plant manager, promptly addressed the one clear instance in which the Plaintiff complained of discrimination or harassment." The court further found that Cerros did not take "any matter, complaint, or allegation through the chain of command" and "did not take advantage of Bennett's open door policy."

We see no way to square these contradictory accounts of Cerros's communications with Steel's supervisors and managers regarding the harassment, both of which are included in the court's September 2003 order. As we noted in *Cerros I*, because there was a full bench trial in this case, FED. R. CIV. P. 52(a) instructs that the district court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses." 288 F.3d at 1044. Furthermore, "whether intentional discrimination occurred itself calls for a finding of fact, and thus the district court's decision on that point must be assessed under the clear error standard." *Id.* Here we are presented with two sets of inconsistent factual findings. Some of them, logically, must be clearly erroneous. Yet, as an appellate court, we have no way to know which ones. As these findings go to the heart of Cerros's hostile work environment claim and Steel's liability, we have no choice but to remand this case for a new trial and for fresh findings of fact.

**B**

Because the court's September 2003 order also misunderstands the law in some respects, we address those points now so that the same problem does not recur. We first examine the court's determination that the racial graffiti in the restroom at Steel's plant did not create a hostile work environment. The court found that the graffiti was not pervasive because it could not "fix a certain number or frequency with any degree of confidence." Turning to the question of severity, the court acknowledged that "[t]he evidence presented does show that some race and national origin related messages (some of which are sharply offensive) appeared as graffiti." In particular, the court stated that "the remarks and graffiti employing the terms 'spic' and 'wetback' and the instruction to 'go back to Mexico' are clearly race and national origin related" and "[t]he use of the word 'spic' could be sufficiently severe to constitute an objectively hostile environment." Nonetheless, the court found that "the conduct at issue was not sufficiently severe or pervasive as to make the working environment hostile or to change the terms and conditions of employment."

In reviewing the court's first order, we expressed concern that the court's finding that Cerros did not suffer a hostile work environment "may have resulted from a misunderstanding about the legal threshold for harassment cases; . . . the district court here may well have set the bar too high as a matter of law." *Cerros I*, 288 F.3d at 1046-47. The court's second order does little to alleviate this concern. While the order correctly uses the disjunctive "or" when discussing the issues of severity or pervasiveness, it does not, taken as a whole, carry through on this point. We reiterate now that conduct that is *either* pervasive *or* severe may give rise to a hostile work environment. See *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (rejecting the "erroneous premise that the harassing words

or conduct had to be both severe *and* pervasive" and emphasizing that "one or the other will do" (internal quotation marks omitted)). Nor did the court seem to appreciate that "even one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000); see also *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1273 (7th Cir. 1991) ("The number of instances of harassment is but one factor to be considered in the examination of the totality of the circumstances."). Otherwise, how could it have said that "certainly the Plaintiff encountered *some* race and national origin related remarks and graffiti in the Defendant's workplace; certainly *some* of these were offensive, unenlightened, and inappropriate; however, they were relatively isolated and infrequent, occurring over the course of more than a year."

We emphasized in *Cerros I* that "[w]hile there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum." 288 F.3d at 1047 (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)). Indeed, we find it difficult to imagine epithets more offensive to someone of Hispanic descent than those directed at Cerros. See, *e.g.*, *Torres v. Pisano*, 116 F.3d 625, 632-33 (2d Cir. 1997) ("[A] reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a 'dumb spic' and told her that she should stay home, go on welfare, and collect food stamps like the rest of the 'spics' to be hostile."). While we acknowledge that the "mere utterance of an [ ] epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotation marks omitted), we also recognize that pervasiveness and severity "are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless

pattern of lesser harassment that extends over a long period of time also violates the statute." *Cerros I*, 288 F.3d at 1047 (internal citation omitted). If, as suggested in the district court's September 2003 order, Cerros was subjected to graffiti calling him a "spic" and "wetback," directing him to "go back to Mexico," and proclaiming "KKK" and "white power," the fact that each individual epithet may have appeared in isolation does not undo their cumulative effect. See *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).

Equally troubling is the court's suggestion that, because Cerros cannot prove that his supervisors authored the graffiti, he cannot rely on the graffiti in making out a hostile work environment claim. In its September 2003 order, the district court stated that "[t]he use of the word 'spic' could be sufficiently severe to constitute an objectively hostile environment; however, the evidence that any supervisor used this specific term is sketchy at best and does not constitute a preponderance of the evidence in this case." The court reiterated this latter point at several points in its discussion, and ultimately cited it as a basis for finding no hostile work environment: "Although the credible evidence before the Court demonstrates that some 'severe' terms appeared in the workplace, the Plaintiff has not shown by a preponderance of the evidence that supervisors played any role in the writing or speaking of these more 'severe' terms."

This implied prerequisite of supervisor involvement to establish a hostile work environment finds no support in the law. As we discuss in a moment, the involvement of supervisors is pertinent to the rules for vicarious liability of the employer, but the distinction between supervisor and coworker misconduct in no way determines whether a plaintiff can state a hostile work environment claim in the first instance. Indeed, we have routinely reviewed hostile

work environment claims arising exclusively from the conduct of coworkers. See, *e.g.*, *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021 (7th Cir. 2004); *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421 (7th Cir. 2004); *Hrobowski*, 358 F.3d at 478; *Shepherd v. Slater Steels Corp.*, 168 F.3d 998 (7th Cir. 1999). Cerros's inability to verify the authorship of the racist graffiti poses no obstacle to his establishing that this graffiti produced or contributed to a hostile work environment.

We turn then to the district court's conclusion that "even if the actions complained of created a hostile or abusive working environment, there is no basis for employer liability." In *Ellerth* and *Faragher,* the Supreme Court established that under Title VII, employers are vicariously liable for hostile environment harassment perpetrated by a supervisor. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 780. The only important qualification is that when, as in Cerros's case, the plaintiff suffered no tangible employment action, the employer is entitled to establish an affirmative defense consisting of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. By contrast, employers are liable for a coworker's harassment only "when they have been negligent either in discovering or remedying the harassment." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997). An employer satisfies its legal duty in coworker harassment cases "if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (internal quotation marks omitted).

There are two aspects of the district court's application of the *Ellerth/Faragher* standard that merit closer examina-

tion. The first involves the court's conclusion that "the Plaintiff did not take advantage of any preventative or corrective opportunities provided by the Defendant." In this connection, the court found that "the Plaintiff did not follow the steps outlined in the Defendant's policies by taking any matter, complaint, or allegation through the chain of command, did not take advantage of Bennett's open door policy, did not submit any complaint in writing, and did not contact the Human Resources office at the corporate head-quarters." Setting aside the inconsistencies between those findings and the others incorporated in the court's order, which we have already discussed, we focus now on the court's suggestion that a plaintiff's failure to follow the reporting mechanisms outlined in an employer's harass-ment policy is a sufficient basis in itself for finding no employer liability.

In *Ellerth* and *Faragher*, the Supreme Court explained that "while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08. At the same time, the Court made clear that compliance with an employer's designated complaint procedure is not the sole means by which an employee can fulfill her "coordinate duty to avoid or mitigate harm." *Faragher*, 524 U.S. at 806. Rather, under the functional approach established in *Ellerth/Faragher*, an employer must prove that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportuni-ties provided by the employer *or to avoid harm otherwise.*" *Ellerth*, 524 U.S. at 765 (emphasis added).

At bottom, the employer's knowledge of the misconduct is what is critical, not how the employer came to have

that knowledge. See *Durkin v. City of Chi.*, 341 F.3d 606, 612 (7th Cir. 2003); *Silk v. City of Chi.*, 194 F.3d 788, 807 (7th Cir. 1999). The relevant inquiry is therefore whether the employee adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm, not whether she followed the letter of the reporting procedures set out in the employer's harassment policy. See, *e.g.*, *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 403 (1st Cir. 2002) (rejecting L.L. Bean's contention that the plaintiff "did not properly notify management of her complaints because she 'bypass[ed] the reporting requirements under L.L. Bean's harassment policies,'" given that she "repeatedly alerted team leaders and supervisors" to the misconduct (internal citation omitted)); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 876 & n.10 (9th Cir. 2001) (observing that, although the plaintiff's complaints to his managers "did not follow the formal reporting requirements of Azteca's anti-harassment policy, they were sufficient to place the company on notice of harassment"). Thus, on remand, the court must determine whether Cerros followed Steel's reporting procedures *or* otherwise brought the harassment he suffered to Steel's attention.

Finally, we pause to consider the requirement that, in the case of supervisor misconduct, the employer exercise "reasonable care to prevent and correct promptly any . . . harassing behavior," *Ellerth*, 524 U.S. at 765, or, in the case of coworker harassment, that it "take reasonable steps to discover and remedy harassment," *Cooper-Schut*, 361 F.3d at 426. In its September 2003 order, the court indicated that Steel had met this standard, explaining:

> Considering the Defendant's policy and training sessions, including the option for employees to contact human resources directly if they believed they were the victim of harassment or if it was not appropriate to report to their supervisor, or they had not received any response to a complaint made to a supervisor and

considering the very general nature of the Plaintiff's and [his co-employee's] testimony, the Court concludes that the Plaintiff has not shown by preponderance of the evidence that the Defendant was negligent in discovering or remedying harassment.

First, it is important to emphasize that the enactment of an anti-harassment policy and the implementation of training sessions for employees is relevant only with respect to whether an employer had notice of harassment and whether it exercised reasonable care to prevent such harassment in the first instance. See *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999) (finding that the "undisputed fact[ ]" that AutoZone adopted a detailed anti-harassment policy and distributed it to its employees "establish[es], as a matter of law, that AutoZone exercised reasonable care to prevent sexual harassment"); *Parkins*, 163 F.3d at 1035 ("In determining whether an employer had notice of harassment, we first determine whether the employer has designated a channel for complaints of harassment."). The mere existence of such a policy, however, does not necessarily establish that the employer acted reasonably in remedying the harassment after it has occurred or in preventing future misconduct. See, *Shaw*, 180 F.3d at 812 ("The first prong of the *Ellerth* affirmative defense also requires AutoZone to prove that it exercised reasonable care to respond to the sexual harassment."); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 188 (4th Cir. 2001) ("[A] jury could rationally conclude that, although Diamond's institution of an anti-harassment policy represented a reasonable step toward preventing the type of abuse suffered by the Spriggs, the company unreasonably failed to correct . . . offending behavior by neglecting to enforce the policy."). Thus, the district court's reliance on Steel's implementation of an anti-harassment policy and its training sessions as a basis for finding that it was not negligent in *remedying* harassment is unfounded.

Second, as we have noted before, "[a]n employer's response to alleged instances of employee harassment must be reasonably calculated to *prevent further harassment* under the particular facts and circumstances of the case at the time the allegations are made." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (emphasis added) (internal quotation marks omitted). "Put differently, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Williams*, 361 F.3d at 1029 (internal quotation marks omitted). Our cases recognize prompt investigation of the alleged misconduct as a hallmark of reasonable corrective action. See, *e.g.*, *Cooper-Schut*, 361 F.3d at 428 (finding employer's actions reasonable when, the day after it was alerted to a highly offensive caricature of the plaintiff, it "began a complete investigation," including interviewing employees in the plaintiff's department and "retain[ing] a forensics expert to analyze the handwriting on the caricature to determine who made it"); *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) (finding that the employer "reasonably attempted to correct and prevent sexual harassment" when it "promptly investigated [the employee's] charges and sought to remedy the problem"); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1993) (emphasizing that the employer "began an investigation the day after [it] was advised of Saxton's complaint"). By the same token, the absence of such action may signal a failure to meet this standard of "prompt and appropriate corrective action." *Williams*, 361 F.3d at 1029. In *Daniels*, for example, we found the employer liable because it was "less than diligent in taking remedial action" in response to recurring graffiti in the employer's restroom proclaiming "KKK" and "All niggers must die." 937 F.2d at 1275. In so holding, we noted that "the restroom graffiti reappeared two to three times after plaintiff first noticed it," a racial slur in another location remained posted at the time the plaintiff left the

company, and, "[i]n addition to dragging its feet on responding to the discrete acts, the defendant made virtually no effort to investigate the incidents." *Id.*

As *Daniels* suggests, although "Title VII does not require that the employer's responses to a plaintiff's complaints . . . successfully prevent[ ] subsequent harassment," *Savino*, 199 F.3d at 933, the efficacy of an employer's remedial action is material to our determination whether the action was "reasonably likely to prevent the harassment from recurring," *Williams*, 361 F.3d at 1029. In *McGinest*, for example, the Ninth Circuit found a disputed issue of material fact about the adequacy of GTE's remedial measures in response to recurring graffiti in the company restroom stating "nigger," "white is right," and "nigger go home." 360 F.3d at 1110. The court observed that, "although painting over the graffiti was a necessary first step, the record before us reveals no actions taken by GTE to ensure that this recurrent problem would cease, and in fact it did not cease." *Id.* at 1120-21. Furthermore, "GTE took no action to send a message that such graffiti was intolerable, or recognize that it differed in kind from other graffiti prevalent in the bathrooms. GTE could have heavily emphasized to all employees that serious punishment would result if the perpetrators of this or future incidents were caught, underlining the fact that such behavior was neither tolerated nor condoned." *Id.* at 1220 n.14. "At a minimum," the court stated, GTE could have "had a manager check the areas in question on a regular basis to ensure this problem did not recur." *Id.* This objection to the employer's failure to engage in effective remedial efforts is consistent with the Supreme Court's insistence in *Faragher* that we "recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty." 524 U.S. at 806. We underscore, therefore, that the district court's analysis of Steel's actions    must    be    consistent    with    these    princi-

ples. Generalized references to Steel's anti-harassment policy will not suffice under the *Ellerth/Faragher* standard.

### III

Already prolonged unnecessarily, this case nevertheless must be remanded for a new trial. The factual inconsistencies in the district court's September 2003 order preclude any meaningful review of its conclusions with respect to Cerros's hostile work environment claim and Steel's liability. Furthermore, the need for a new trial was made more obvious at oral argument when Steel's counsel, John Baumann, who also served as Steel's manager of human resources during Cerros's tenure at the company, offered his firsthand account of the company's remedial efforts in response to Cerros's complaints. Counsel's statements at argument, perhaps more aptly characterized as testimony, raise serious concerns under Indiana Rule of Professional Conduct 3.7(a) (made effective in the District Court for the Northern District of Indiana pursuant to Local Rule 83.5(f)), which bars a lawyer from acting as an advocate at a trial in which she is likely to be a necessary witness, except in limited circumstances. The comment accompanying Rule 3.7 cautions that, when an attorney fails to comply with this Rule, "[i]t may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof," and we found ourselves mired in this very uncertainty at argument.

For these reasons, the judgment of the district court is REVERSED, and this case is REMANDED for a trial on the hostile work environment claim consistent with this opinion. Circuit Rule 36 shall apply on remand.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*