In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3568

MAETTA VANCE,

*Plaintiff-Appellant,*

*v.*

BALL STATE UNIVERSITY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-cv-1452—**Sarah Evans Barker**, *Judge.*

ARGUED NOVEMBER 29, 2010—DECIDED JUNE 3, 2011

Before BAUER, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Maetta Vance was the only African-American working in her department at Ball State University ("Ball State") when racially charged discord erupted. In 2005, Vance began filing complaints with Ball State about her coworkers' offensive conduct, which included the use of racial epithets, references to the Ku Klux Klan, veiled threats of physical harm, and other unpleasantries. In 2006 she filed two complaints with the

Equal Employment Opportunity Commission ("EEOC") for race discrimination and, later, retaliation. After getting her right-to-sue letter, she filed this action in federal court alleging a range of federal and state discrimination claims. The district court granted summary judgment for the defendants and dismissed the case. On appeal, Vance pursues only her hostile work environment and retaliation claims against Ball State based on asserted violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* Because she has not established a basis for employer liability on the hostile work environment claim or put forth sufficient facts to support her retaliation claim, we affirm.

**I**

Ball State prevailed on summary judgment, and so we recite the facts in the light most favorable to Vance, the non-moving party. Vance began working for Ball State in 1989 as a substitute server in the Banquet and Catering Department of University Dining Services. In 1991, Ball State promoted Vance to a part-time catering assistant position, and in January 2007 Vance applied and was selected for a position as a full-time catering assistant. Between 1991 and 2007, Vance gained expertise as a baker and enjoyed the challenge of baking items from scratch. After she began work as a full-time employee, a position that included a modest raise and a significant increase in benefits, her assignments changed. Her new work consisted of preparing food, including dinners for formal events, boxed lunches for casual engage-

ments, and sides and salads, for the catering department's clients.

For many years things progressed uneventfully. But in 2001, Saundra Davis, a coworker, hit Vance on the back of the head without provocation. The two were discussing a work-related duty when Davis became aggressive, shouted at Vance, and slapped Vance as she turned away. Vance orally complained to her supervisors, but because Davis soon transferred to another department Vance did not pursue the matter. Also around that time, Bill Kimes became Vance's supervisor. According to Vance, Kimes gave her the cold shoulder, made her feel unwelcome at work, and treated other employees to lunch when she was not around. He refused to shake her hand when they first met in 2001, and he routinely used a gruff tone of voice with her.

Things took a turn for the worse in 2005. Davis returned to Vance's department, and on September 23, 2005, the two had an altercation in the elevator. Davis stood in Vance's way as she tried to get off the elevator and said, "I'll do it again," which Vance took to be a reference to the slap in 2001. A few days later, Vance heard from a fellow employee that another coworker, Connie McVicker, used the racial epithet "nigger" to refer to Vance and African-American students on campus. McVicker also boasted that her family had ties to the Ku Klux Klan. On September 26, 2005, Vance complained orally to her supervisor about McVicker's statements, and on October 17, 2005, she called University Compliance to request a complaint form. While requesting

the document, Vance again complained about McVicker's racially offensive comments and, for the first time, informed Ball State that Davis had slapped her four years earlier. In early November, Vance submitted a written complaint detailing McVicker's comments and the elevator incident with Davis.

Ball State began investigating Vance's complaint regarding McVicker immediately. Once Vance spoke to University Compliance on October 17, 2005, two supervisors, Lisa Courtright and Kimes, met to discuss how to handle the matter. Courtright sent Vance a letter to inform her that they were investigating. In the meantime, several people from Employee Relations became involved. Kimes's investigation corroborated Vance's account of what McVicker said, although the witnesses could not recall whether McVicker used the epithet generally or directed it at Vance. The Assistant Director of Employee Relations sent an email to the Director, stating: "I know we don't have the specifics on exactly what and when these utterances were . . . but we need to make a strong statement that we will NOT tolerate this kind of language or resulting actions in the workplace." Ball State used a four-step process to handle employee discipline, starting with a verbal warning for the first infraction, followed by a written warning for the second, with escalating consequences for further violations. Within this context, the Assistant Director concluded, "I think we can justify going beyond our limited prior past history and issue a written warning . . . we should also strongly advise her verbally when we issue this that it must stop NOW and if the

words/behavior are repeated, we will move on to more serious discipline up to an[d] including discharge."

Following this recommendation, Kimes gave McVicker a written warning on November 11, 2005, for "conduct inconsistent with proper behavior." The warning explained that McVicker was being disciplined for using offensive racial epithets, discussing her family's relationship with the KKK, and also "looking intently" and "staring for prolonged periods at coworkers." Kimes advised McVicker that additional violations would lead to further disciplinary action. Days later, Courtright met with McVicker to discuss the warning; Courtright reiterated that racially offensive comments would not be tolerated. She also suggested that McVicker should consider avoiding Vance and transferring to another department.

That same day, Vance complained to Courtright that McVicker referred to her as a "porch monkey." Courtright advised Vance to tell Kimes, which Vance did. Kimes investigated by speaking to another coworker whom Vance said witnessed the incident, but that coworker did not corroborate Vance's allegation. In turn, Kimes told Vance that without any witnesses he could not discipline McVicker, who denied making the comment. Kimes said that further action on this issue would devolve into a "she said-she said" exchange. Kimes did not discipline McVicker for the "monkey" comment, nor does the record suggest that Courtright mentioned it when she spoke to McVicker later that week. Kimes did, however, try unsuccessfully to schedule McVicker

and Vance to work on alternating days. Over a year later, McVicker voluntarily transferred to another department.

In response to Vance's complaint about the September 23, 2005, elevator incident with Davis, Ball State investigated but found conflicting accounts of what had happened. Before Vance filed her written complaint on November 7, 2005, Davis had filed a complaint alleging that Vance said to Davis: "Move, bitch . . . you are an evil f------ bitch." Kimes discussed the situation with his supervisor, and they decided that counseling both employees about respect in the workplace was the best path to follow. Kimes spoke with Vance about how to communicate respectfully in the workplace, but it is unclear whether he had a similar conversation with Davis. No one was disciplined for the incident. Around this time, though the record is not clear about the date, Davis made references to "Sambo" and "Buckwheat" while having a conversation with another coworker in Vance's presence. Vance understood these words to be used in a racially derogatory way and thus felt offended by them, but she did not complain to Ball State at that time.

Conditions were not improving for Vance, and on December 22, 2005, she informed Kimes that she felt threatened and intimidated by her coworkers. The following week Vance filed a charge with the EEOC alleging race, gender, and age discrimination. Vance also complained that, throughout this period, Davis and McVicker gave her a hard time at work by glaring

at her, slamming pots and pans around her, and intimidating her. In 2006, Vance filed a complaint identifying a variety of other instances where she felt harassed, including being "blocked" on the elevator by Davis who "stood there with her cart smiling"; being left alone in the kitchen with Davis, who smiled at her; and being around Davis and McVicker, who gave her "weird" looks. She also filed a complaint alleging that Karen Adkins, a supervisor, "mean-mugged" her. Ball State investigated these incidents but found no basis to take disciplinary action.

On May 10, 2006, Vance filed a complaint with Ball State against her supervisor, (still) Kimes, alleging that he forced her to work through breaks. Ball State investigated but found no factual basis for the allegation. In August 2006, Vance filed a second complaint with the EEOC alleging that Ball State retaliated against her by assigning her diminished work duties, forcing her to work through breaks, denying her the chance to work overtime hours, and unequally disciplining her. She filed this lawsuit on October 3, 2006.

While her case was pending before the district court, Ball State promoted Vance to the position of a full-time catering assistant. Still, the strife did not abate. In April 2007, Vance filed a grievance against McVicker for saying "payback" to her. Three supervisors, including Kimes, investigated; McVicker countered that Vance had said to her: "Just the beginning bitch—you better watch your house." Both women denied the allegations against them, and Ball State did not discipline

anyone. In August 2007, Davis said to Vance, "are you scared," in a Southern accent. Ball State investigated and warned Davis verbally not to engage in such behavior. That same month, Vance complained that during a routine day of work Kimes aggressively approached her while repeatedly yelling the same question at her. When Ball State investigated, the witness identified by Vance did not corroborate her account of the incident. Instead, the witness supported Kimes's version of what had occurred and added that it was common for Kimes to repeat himself until he was sure the other person had heard him. In September 2007, Davis complained that Vance splattered gravy on her and slammed pots and pans around her. Vance denied the allegation but, even though no witnesses corroborated the event, Ball State warned Vance about its policies.

Vance also complains that Ball State retaliated against her for complaining about the racial harassment. Although she was promoted in 2007, Vance argues that Ball State reassigned her to menial tasks such as cutting vegetables, washing fruit, and refilling condiment trays. In her view, Ball State made her into a "glorified salad girl" even though she possessed a range of advanced skills that could have been better utilized baking or cooking complete meals.

## II

### A

Before reaching the merits of Vance's claim, we must resolve an evidentiary issue. After all dispositive

motion deadlines had passed and both parties had submitted their summary judgment briefs, Vance sought to supplement the record with evidence of two incidents that took place in early 2008. The evidence included two affidavits testifying to a verbally abusive encounter with Davis's daughter and husband. During that incident, Davis's kin insulted Vance and another coworker with racial epithets and physically threatened them on university property. The affidavits document this episode and Kimes's alleged failure to respond when Vance complained. Vance also submitted two articles published in an on-line Ball State forum that discussed Vance's discrimination claims against the university, along with scores of "comments," some racially offensive, posted in response to the articles. One of the articles was written by one of Vance's coworkers.

Vance submitted the evidence on March 12, 2008, and Ball State moved to strike. Ball State argued before the district court that Vance was attempting "an end run" around Federal Rule of Civil Procedure 15(d) by styling her submission as a supplement to the summary judgment record rather than a supplemental pleading. The district court concluded that Vance's supplemental evidence fell within the purview of Rule 15(d), analyzed it as if Vance had filed a Rule 15 motion, and granted Ball State's motion to strike. On appeal, Vance asserts that the court should have permitted her to supplement the record, while Ball State defends the district court's ruling on the ground that the contested evidence presents new factual allegations against persons not party to this lawsuit.

In our view, these materials are best viewed as sup-plemental to the summary judgment record rather than as a disguised Rule 15(d) submission. When a plaintiff initiates a hostile work environment lawsuit, as op-posed to a suit claiming discrimination based on discrete acts, she usually complains of an employer's continuing violation of Title VII "based on the cumulative effect of individual acts." See *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (recognizing that hostile environment claims by their very nature involve repeated conduct). The continuing violation doctrine is usually invoked to defeat a statute of limitations bar for conduct that falls outside the relevant period, see *Dandy v. UPS, Inc.*, 388 F.3d 263, 270 (7th Cir. 2004), but we think the general concept is instructive in this context as well. That is, a Title VII hostile work environ-ment claim is against the employer for the aggregate conduct of one or more of its employees. By adding more "individual acts" as evidence of a hostile work environment claim, a plaintiff does no more than strengthen her evidentiary record; this is not enough to allege a discrete new claim. See *Morgan*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts.").

Thus, Ball State misses the mark when it contends that these materials implicate persons not named as defendants in this lawsuit. Title VII regulates the conduct of employers, not individual employees. See 42 U.S.C. § 2000e-2(a). If admitted, Vance's supplemental evidence might have cast some light on her hostile work environ-ment claim against Ball State. Whether Ball State is

liable for the conduct of an employee's family member or statements in a university publication is a separate question we need not resolve, because the district court did not abuse its discretion in excluding the evidence. Vance moved to supplement the record after the deadlines for discovery and dispositive motions had "long passed." We regularly affirm a district court's decision to exclude supplemental evidence in the interest of keeping cases moving forward. See, *e.g.*, *Pfeil v. Rogers*, 757 F.2d 850, 858 (7th Cir. 1985).

B

Turning to the merits, we apply the well-known *de novo* standard of review to Vance's case. See *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 912 (7th Cir. 2010). Vance argues that the facts she has alleged and supported are sufficient to get her case before a jury, which would then determine whether her hostile work environment and retaliation claims are meritorious. We examine each of her arguments in turn.

Title VII prohibits employers from discriminating against a person with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Ball State, however, is not liable to Vance under Title VII for a hostile work environment unless Vance can prove (1) that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer

liability. See *Dear v. Shinseki*, 578 F.3d 605 (7th Cir. 2009); *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) ("*Cerros I*"). We emphasize, as we have before, that the third element of the plaintiff's *prima facie* case is in the disjunctive—the conduct must be *either* severe *or* pervasive. See *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) ("*Cerros II*"). The question whether there is a basis for employer liability depends on whether the alleged harassment was perpetrated by supervisors or coworkers. See *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004); see generally *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998). Employers are "strictly liable" for harassment inflicted by supervisors, but they can assert an affirmative defense when the harassment does not result in a tangible employment action. 361 F.3d at 1039 *(*citing *Ellerth*, 524 U.S. at 756 and *Faragher,* 524 U.S. at 807-08*)*. If only coworkers were culpable for making a work environment hostile, the plaintiff must show that the employer has "been negligent either in discovering or remedying the harassment." *Id.* (internal citations omitted)*.*

Vance argues that three supervisors, Kimes, Adkins, and Davis, harassed her on account of her race. To begin, Vance argues that there are disputed facts regarding whether Davis was her supervisor, making summary judgment inappropriate on this issue. We find no such ambiguity. Under Title VII, "[a] supervisor is someone with power to *directly* affect the terms and conditions of the plaintiff's employment*." Rhodes v. Ill. Dep't of*

*Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). That authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (internal quotation marks and citations omitted). We have not joined other circuits in holding that the authority to direct an employee's daily activities establishes supervisory status under Title VII. See *Rhodes*, 359 F.3d at 509 (Rovner, J., concurring) (arguing for a broader standard of supervisor liability based on EEOC guidelines). We conclude that Vance has not revealed a factual dispute regarding Davis's status by asserting that Davis had the authority to tell her what to do or that she did not clock-in like other hourly employees. This means that we must evaluate her claim against Davis under the framework for coworker conduct.

We can also summarily dispose of Vance's allegations against supervisor Adkins. Vance's brief says little about what Adkins may have done to make her work environment hostile. Before the district court, Vance argued that Adkins "mean-mugged" her and stared at her when they were in the kitchen together. Making an ugly face at someone and staring, while not the most mature things to do, fall short of the kind of conduct that might support a hostile work environment claim.

Vance's complaints about Kimes require a closer look, but this reveals that she has failed to establish that Kimes's conduct had a racial "character or purpose." See *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Although there is some indication in the record that

Kimes was generally difficult to work with, we assume, favorably to Vance, that he picked on her. Still, even in that light, Vance's allegations do not establish that Kimes's unkind or aggressive conduct was motivated by Vance's race. Although a plaintiff does not need to identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim, she must be able to attribute a racial "character or purpose" to it. See *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). Vance has not put forth any facts to establish that any of Kimes's conduct was motivated by, or had anything to do with, race. To the contrary, in her deposition Vance conceded that she never heard Kimes say anything suggesting ill will towards her because of her race, nor did any other employee report to Vance that Kimes had uttered racially derogatory comments. The undisputed facts establish that there are no grounds for employer liability for violation of Title VII based on the conduct of Vance's supervisors.

This leaves Vance's treatment at the hands of her two coworkers, Davis and McVicker. When evaluating a hostile work environment claim, we consider "the entire context of the workplace," see *Cerros I*, 288 F.3d at 1046, not the discrete acts of individual employees. The district court analyzed Vance's allegations against Davis and McVicker separately, finding that summary judgment was proper based on the conduct of each woman independently. We stress that a hostile work environment claim requires a consideration of all the circumstances, because in the end it is the employer's liability that is at issue, not liability of particular employees. Thus, for

example, if we had found that Vance's supervisors had contributed to a racially hostile work environment, that conduct would form part of the context for Vance's claim against Ball State, just as the actions of her co-workers would. The only reason we have divided our analysis between the conduct of supervisors and employees is to ensure that we are respecting the standards for vicarious liability that apply. See *Williams*, 361 F.3d at 1029.

Assuming without deciding that Vance's allegations against her coworkers satisfy the first three elements of a Title VII hostile work environment claim, we conclude nonetheless that Vance cannot prevail because there is no basis for employer liability. See *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048-49 (7th Cir. 2000) ("We do not decide whether a hostile work environment existed because the question whether [the employer] took prompt and effective action is dispositive here."). For Ball State to be liable, Vance must put forth sufficient facts to establish that it was negligent in failing to "take reasonable steps to discover and remedy the harassment." *Cerros II*, 398 F.3d at 953. Once aware of workplace harassment, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004) (internal citations omitted). While it is unfortunate that Ball State's remedial measures did not persuade Davis or McVicker to treat Vance with respect, and we have nothing but condemnation for the type of conduct Vance has alleged,

we find that Ball State satisfied its obligation under Title VII by promptly investigating each of Vance's complaints and taking disciplinary action when appropriate. See *Porter v. Erie Foods Int'l Inc.*, 579 F.3d 629, 636 (7th Cir. 2009) ("Our focus, therefore, is on whether [the employer] responded promptly and effectively to the incident.").

Between October 2005 and October 2007, Vance filed numerous complaints about her troublesome encounters with Davis and McVicker. Ball State took reasonable corrective action as Vance lodged each complaint. In response to Vance's complaint that McVicker used the racial epithet "nigger" and bragged about her family connections with the Ku Klux Klan, Ball State promptly investigated, involved the appropriate supervisory personnel, and issued a written reprimand to McVicker. According to Ball State policy, McVicker technically should have received a stage-one oral warning because she had no prior complaints on her record, yet the university concluded that a more serious measure was in order. The written warning conveyed to McVicker that her racially offensive language would not be tolerated, and two supervisors met with McVicker separately to discuss the matter. Meanwhile, a supervisor remained in contact with Vance and assured her that they were investigating her complaint.

Vance lodged two additional complaints against McVicker during this period, one in November 5, 2005, for referring to her as a "porch monkey" and one in April 2007 for saying "payback." In response to the 2005

complaint, Ball State again promptly investigated, but a witness identified by Vance could not corroborate that McVicker used the offensive term to refer to Vance. Similarly, Ball State uncovered competing versions of what took place in connection with Vance's 2007 "payback" complaint. When Ball State questioned McVicker about the incident, she counter-complained that Vance said: "Just the beginning bitch—you better watch your house."

Again, we are taking the view of these facts that favors Vance; we express no opinion about what "really" happened. From that perspective, we assume that McVicker made the alleged statements. On the issue of employer liability, however, we must look at the employer's response in light of the facts it found in its investigation. See *Porter*, 579 F.3d at 636 (observing that, "taken as a whole," the employer "took appropriate steps to bring the harassment to an end"). It may be commonplace that an employee accused of verbally abusing or intimidating a coworker denies the allegation. But Ball State did what it could and did not stop by accepting a simple denial. Moreover, the record does not reflect a situation in which all ties went to the discriminator; if it did, we would be inclined to send this case to a jury. Ball State, however, calibrated its responses depending on the situation. Sometimes when it was unsure who was at fault it counseled both employees; sometimes it warned alleged wrongdoers to take care or desist.

Vance complained to her supervisors several times about Davis's conduct. The two most serious allegations

relate to the elevator incident in 2005 and the "are you scared" comment in 2007. We note that Vance conceded at her deposition that she did not complain to Ball State about Davis's use of the terms "Sambo" and "Buckwheat." We take Vance at her word that, in context, the terms "Sambo" and "Buckwheat" were used as explicit racial slurs that would require remedial measures from an employer under Title VII. See *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1266 (7th Cir. 1991) (noting "Buckwheat" is a racial taunt); *Boyd v. State Farm Ins. Co.*, 158 F.3d 326 n.1 (5th Cir. 1998) ("[I]n the context of employment discrimination law, the term 'Buckwheat' is generally considered to be a racial slur or epithet."). Under Title VII, however, an employer's liability for coworker harassment is not triggered unless the employee notifies the employer about an instance of racial harassment.

Ball State first learned of the September 23, 2005, altercation from Davis, when she filed a complaint against Vance for saying, "Move, bitch . . . you are an evil f------ bitch." Later, Vance complained that Davis had said, "I'll do it again," referring to, according to Vance, the time in 2001 when Davis slapped her. Ball State investigated, but both women stuck to their stories and denied saying anything offensive to the other. Ball State's response to this altercation was reasonable. We have said that Title VII is "'not . . . a general civility code' and we will not find liability based on the 'sporadic use of abusive language.'" *Ford v. Minteq Shapes and Services, Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Faced with competing complaints, the first of which was lodged against Vance,

Ball State pursued a reasonable course of action by coun-
seling *both* employees about civility in the workplace.
Finally, after Vance complained that Davis said "are
you scared" to her in a Southern accent, Ball State again
investigated. Although Davis denied making the state-
ment, Ball State again formally warned Davis orally to
refrain from such actions. This response was reasonable
in light of the circumstances.

The catering department was undoubtedly an unpleasant
place for Vance between 2005 and 2007. Yet the record
reflects that Ball State promptly investigated each com-
plaint that she filed, calibrating its response to the
results of the investigation and the severity of the
alleged conduct. As we have said before, prompt investi-
gation is the "hallmark of reasonable corrective action."
*Cerros II*, 398 F.3d at 954. This is not a case where the
employer began to ignore an employee's complaints as
time went on. Ball State investigated Vance's complaint
against Davis in 2007 with the same vigor as it did
her complaint in 2005. Of course, the ideal result of an
employee's complaint would be that the harassment
ceases. But Title VII does not require an employer's
response to "successfully prevent[] subsequent harass-
ment," though it should be reasonably calculated to do
so. *Cerros II*, 398 F.3d at 954 (quoting *Savino v. C.P. Hall
Co.*, 199 F.3d 925, 933 (7th Cir. 1999)). In this case, we
conclude that the undisputed facts demonstrate that
there is no basis for employer liability.

C

Vance also alleges that Ball State retaliated against her for complaining about the racial harassment by reassigning her to menial tasks, denying her overtime hours, and unequally disciplining her. Employers may not punish employees for complaining about workplace conduct that even arguably violates Title VII. 42 U.S.C. § 2000e-3(a); *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003). To establish a *prima facie* case of retaliation, a plaintiff may use either the direct or indirect method of proof. Vance is proceeding only under the indirect method, which requires her to show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to the employer's expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee. *Stephens v. Erickson*, 569 F.3d 777, 787 (7th Cir. 2009). Once the plaintiff establishes her *prima facie* case, the burden shifts to the defendant to establish a non-invidious reason for the action. The burden then shifts back to the plaintiff to show that the defendant's reason was pretextual. *Id.* Ball State concedes that Vance engaged in a protected activity and does not claim Vance's work performance was sub-par. Our focus is thus on the final two elements of Vance's *prima facie* case.

It is possible for a plaintiff to establish a claim of retaliation based on a change of work responsibilities, "depend[ing] on how much of a change, and how disadvantageous a change, took place." *Sitar*, 344 F.3d at 727; see

also *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002) (listing cases). In order to succeed, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse.'" *Lapka v. Chertoff*, 517 F.3d 974, 985 (7th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Generally, if the challenged action would discourage other employees from complaining about employer conduct that violates Title VII, it constitutes an adverse employment action. See *Burlington,* 548 U.S. at 57, 68.

Vance's strongest argument depicts an unusual instance of retaliation, in which Ball State simultaneously promoted her and assigned her to diminished work duties in 2007. The district court observed that whether Vance suffered a materially adverse employment action was a close call, but it concluded that a jury could conclude that her reassignment was materially adverse. Still, the district court concluded that Vance's theory fails because she did not establish that she was treated less favorably than a similarly situated employee. We agree with the district court, and conclude in addition that Vance cannot show that she suffered a materially adverse employment action.

Vance concedes that her promotion included a modest pay raise and a significant increase in benefits. She argues, however, that once promoted she was assigned to more menial tasks. In particular, she asserts that Ball State assigned her to cut vegetables and refill condiments, while entrusting her coworker, Brad Hutson, with more

complicated tasks such as preparing complete meals. We recognize that it is possible for an employer to retaliate clandestinely against an employee while formally promoting her, but the record cannot be stretched to support such a theory here. Vance personally sought out the new full-time position; it was her choice to leave the part-time position where she baked often and was generally content with her work assignments. Her new job included some of the tasks about which she is complaining, but it also included a range of other tasks including preparing more complicated dishes. While Vance may have been disappointed with her new assignments, considering the entire context of her promotion we conclude that no rational jury could find that she experienced a materially adverse employment action.

Put another way, we find that a reasonable person would not be dissuaded from complaining about race discrimination by witnessing the treatment Vance received: a promotion to a full-time position with accompanying benefits, a raise in pay, and—taking all of Vance's allegations as true—a change in work assignments that included basic salad preparation. This case does not present the problem we encountered in *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658 (7th Cir. 2005), where we reversed a grant of summary judgment based on the notion that a change in work schedule that did not affect salary or duties could not constitute an adverse employment action. In *Washington*, we observed that while a reassignment that does not affect pay or opportunities for promotion will "by and large" not be actionable for a retaliation claim under Title

VII, " 'by and large' differs from 'never.' " *Id.* at 662. When, as in that case, the employer exploits a known vulnerability of an employee—the plaintiff there relied on her previously established flex-time schedule so she could care for her son, who had Down syndrome—an altered work schedule can constitute an adverse work action. *Id.* Even though a change in assignments, like an altered work schedule, conceivably might amount to an adverse employment action, Vance must allege more than a dislike for her new assignments or a preference for her old ones for her case to go forward.

Approaching the issue as the district court did, by asking whether there was a similarly situated employee, leads to the same result. Only two employees held the position of a full-time catering assistant at the time of this dispute, Vance and Hutson. Both employees were promoted to that position on the same day, and for the most part both were assigned to the same range of duties. We accept Vance's allegation that their work assignments were not identical, but the record reflects that they were assigned to a substantially similar set of tasks. Thus, even if Vance had established that Ball State subjected her to a materially adverse action, her claim would fail because she has not satisfied the final element of the *prima facie* analysis.

Vance also alleges that Ball State retaliated by offering her fewer opportunities to work overtime hours. We said in *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007), that the loss of opportunity to work overtime can amount to an adverse employment action. The

parties agree that Vance worked fewer overtime hours than Brad Hutson in 2007. Ball State defends by arguing that Hutson is not similarly situated to Vance because he worked significantly more regular hours than her, which, as a consequence, made him available to work more overtime hours. This is in part because Ball State has a "work continuation" policy, which mandates that the employee who began a task that is unfinished at the end of a shift must stay and get the task completed.

The record indicates that Vance often took FMLA leave, called in sick unexpectedly, and left work early for health reasons. Vance does not dispute that she worked fewer regular hours than Hutson. Instead, she argues that, because she was the more senior employee, she should have been offered more opportunities to work overtime. She adds, without citation or support, that the work continuation policy Ball State relies on is "void." Neither of these arguments is availing. Even if Vance had seniority over Hutson, the undisputed facts establish that they did not work a comparable number of regular hours. Thus, the two are not similarly situated for the purpose of this analysis. Vance's assertion that the work continuation policy is void, without citing evidence in the record, is unhelpful. We have repeatedly said that a "nonmoving party cannot defeat a motion for summary judgment with bare allegations." *de la Rama v. Illinois Dep't of Human Services*, 541 F.3d 681, 685 (7th Cir. 2008).

Finally, Vance argues that Ball State retaliated against her by issuing her a verbal warning for allegedly splat-

tering gravy on Davis and slamming pots and pans on the counter. Although we give the concept of an adverse employment action a generous construction, it is not this broad. Vance appears to concede as much, altering her argument slightly on appeal to claim that Ball State's warning to Vance amounts to taking the side of those who harassed her, which she sees as retaliation through the creation of a more hostile work environment. No reasonable jury could find that the delivery of a verbal warning, based on a complaint from a coworker, constitutes an adverse employment action or creates an objectively hostile work environment.

The judgment of the district court is AFFIRMED.