In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2331

AHMAD JAJEH,

*Plaintiff-Appellant,*

*v.*

COUNTY OF COOK,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09-cv-7227—**John W. Darrah**, *Judge.*

ARGUED JANUARY 19, 2012—DECIDED MAY 2, 2012

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Dr. Ahmad Jajeh was an attending physician in the Hematology/Oncology Department at John H. Stroger, Jr. Hospital of Cook County, until extensive budget cuts forced the County to lay off over 200 physicians, including Dr. Jajeh. Following his termination, Dr. Jajeh brought suit in district court claiming he was subjected to discrimination on the basis of his religion and national origin, and terminated in retalia-

tion for his complaints about the discrimination he suffered. The district court granted summary judgment in favor of Cook County, finding no evidence that Dr. Jajeh suffered discrimination or that he was laid off in retaliation for his complaints. We affirm.

## I. BACKGROUND

Dr. Jajeh, a Muslim born in Syria, worked at Stroger Hospital for sixteen years, beginning in 1991. By all accounts, he performed his duties satisfactorily for most of this time and was employed without incident until about 2003. That year, Dr. Jajeh began having problems with Dr. Roslyn Catchatourian, another hematologist in the department who had previously been in private practice. Most of the problems with Dr. Catchatourian concerned the type of disputes one might expect to find in a hospital, such as arguments over the proper assignment of interns, heavy workloads, and improper schedule assignments. But Dr. Catchatourian also made some derogatory comments about Dr. Jajeh because he was a Muslim from Syria. And as time went on, the conflict between the two doctors escalated.

Dr. Jajeh soon began making formal complaints about Dr. Catchatourian to Dr. Thomas Lad, Chairman of the Oncology Department. In a letter written to Dr. Lad on September 23, 2004, Dr. Jajeh noted that he had already made three previous complaints regarding Dr. Catchatourian's conduct. The letter then describes the causes of "friction that exist[] between [Dr. Jajeh] and Dr. Catchatourian," including Dr. Catchatourian's "domineering attitude," her "creating a private practice like

atmosphere" in the clinic, and "overflowing her clinic with patients." Notably absent from this letter is any complaint that Dr. Catchatourian made a derogatory comment about Dr. Jajeh's religion or national origin.

Dr. Jajeh wrote a second letter to Dr. Lad on October 26, 2004, stating that he had been "discriminated against in your department [by Dr. Catchatourian]." But after making this claim, the letter does not allege any discrimination related to religion or national origin. Instead, it details similar concerns as the previous letter, stating that Dr. Catchatourian "disrespect[ed]" Dr. Jajeh's clinical decisions, "creat[ed] an atmosphere of confusion and chaos," and "creat[ed] schedules that fit her own comfort and advantage." Although Dr. Lad attempted to mediate the conflict between the two doctors, the hostility between them persisted.

Soon, Dr. Lad grew weary of listening to Dr. Jajeh's frequent complaints. And Dr. Jajeh, for his part, felt that Dr. Lad was complicit in allowing Dr. Catchatourian's domineering ways to continue. As a result, Dr. Jajeh started having problems with Dr. Lad, and began complaining about him as well. For example, Dr. Jajeh wrote a third letter to Dr. Lad on December 22, 2005, vaguely protesting a lack of workplace safety. The letter then states that Dr. Lad's conduct was a "form of favoritism, harassment and feeling of grandiosity."

Two other incidents with Dr. Lad would prove to be important. In 2006, Dr. Lad instituted an administrative hearing against Dr. Jajeh for an alleged altercation with a patient, and for leaving work early to attend a

pharmaceutical meeting while he had patients waiting for him. An independent hearing officer, Paris Partee, concluded that Dr. Jajeh violated hospital policy, and subsequently referred him to anger management. Later that same year, Dr. Lad delayed the submission of Dr. Jajeh's credential-renewal application, pending Partee's official report from the administrative hearing. In a letter to Dr. Brendan Reilly, Chairman of the Department of Medicine, Dr. Lad stated that he believed this delay had caused Dr. Jajeh's credentials to be suspended. Dr. Lad considered using the suspension as an excuse to terminate Dr. Jajeh, stating that "this was an opportunity to solve a problem that has been going on ever since [Dr. Lad arrived at the hospital]." But Dr. Lad instead decided that Dr. Jajeh should be reinstated because he was "likely to get a lawyer."

Dr. Jajeh wrote a final letter complaining about his work environment on December 27, 2005—this time to Dr. Janice Benson, President of the Medical Staff at Stroger Hospital. In the letter, he complained of "frank discrimination" by both Drs. Lad and Catchatourian. But, just as in his previous letters, Dr. Jajeh's complaints only refer to personality issues with Dr. Catchatourian that "preclude [Dr. Jajeh] from having a safe working place." The letter makes no mention of religion or national origin, or of any slurs or derogatory comments made by Dr. Catchatourian. Dr. Jajeh eventually filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on October 30, 2006, alleging for the first time retaliation and discrimination on the basis of his religion and national origin.

In 2007, facing an overall budget shortfall of $500 million, Cook County directed that $130 million be cut from the Bureau of Health budget. As a result of the cutbacks, 650 Bureau of Health employees were laid off. Of those laid-off employees, 200 were physicians from Cook County hospitals, including Stroger Hospital—and Dr. Jajeh.

Dr. Robert R. Simon, Interim Chief of the Bureau of Health for Cook County, determined the level of cuts necessary at each institution and established criteria for evaluating individual physicians. Rather than relying on seniority, physician evaluations were based on: (1) negative performance reviews; (2) excess medical malpractice settlements; and (3) productivity in clinics, wards, and operating rooms. Personnel in departments facing cuts were interviewed by three other physicians of mixed race, sex, and national background.

Although there were efforts to resist any cuts to the Hematology/Oncology Department, it was eventually selected for a reduction in force. At the time, three hematologists were employed: Dr. Catchatourian, Dr. Jajeh, and Dr. Margaret Telfer. Dr. Telfer was a part-time employee, while the other two doctors worked full-time. Three physicians conducted their interviews: Dr. Reilly, Dr. Enrique Martinez, and Dr. Krishna Das. The three evaluated hematologists completed identical questionnaires and were interviewed separately by Drs. Reilly, Martinez, and Das.

After the interviews, Dr. Reilly prepared a score sheet. Dr. Catchatourian scored 1,640 points, receiving additional points because she was a specialist in bone-marrow

transplants and because she held a key faculty position. Dr. Telfer scored 1,400 points, receiving additional points because she was director of a fellowship program. Dr. Jajeh scored the lowest with 984 points, and had points deducted for a negative performance review—the administrative hearing that Dr. Lad initiated in 2006. Having scored the lowest, Dr. Jajeh's position was eliminated from the 2007 budget and he was laid off. Subsequently, Dr. Telfer became a full-time employee.

Dr. Jajeh brought suit against Cook County under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging retaliation and discrimination based on religion and national origin. The district court granted summary judgment in favor of Cook County on all counts, finding no evidence that Dr. Jajeh was eliminated from his position based on any discriminatory or retaliatory animus. Rather, he was selected for termination based on objective criteria used in county-wide budget cuts. The district court also found that Dr. Jajeh's discrimination claim encompassed a hostile-work-environment claim, but held that there was no evidence suggesting any alleged harassment occurred on the basis of his religion or national origin. Dr. Jajeh filed this timely appeal, challenging the district court's grant of summary judgment for his hostile-work-environment and retaliation claims.[1]

---

[1] Dr. Jajeh does not appeal the district court's grant of summary judgment in favor of Cook County for his discrimina-

(continued...)

## II. ANALYSIS

We review the grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Hostile Work Environment

Dr. Jajeh first argues that the district court erred in granting summary judgment in favor of Cook County for his hostile-work-environment claim because he was subject to severe harassment by Dr. Catchatourian. To survive a summary judgment motion on this claim, Dr. Jajeh must demonstrate: "(1) that [his] work environment was both objectively and subjectively offensive; (2) that the harassment was based on [his religion or national origin]; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011), *petition for cert. filed*, 80 U.S.L.W. 3301 (U.S. Oct. 31, 2011) (No. 11-556).

As a preliminary matter, Cook County asserts that Dr. Jajeh's hostile-work-environment claim was not

---

[1] (...continued)

tion claim alleging he was terminated from his position because of his religion and national origin.

properly raised in his complaint. Dr. Jajeh's complaint alleges discrimination based on religion and national origin, but does not explicitly state that he was subjected to a hostile work environment. Because Dr. Jajeh did not specifically mention the words "hostile work environment" until his response to Cook County's motion for summary judgment, Cook County concludes, we should not consider the issue. We disagree.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This statutory language covers both discrete acts of discrimination (such as termination) and acts that create a hostile workplace. *Turner v. Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010) (*citing Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002)). Under the notice-pleading standard of the Federal Rules of Civil Procedure, a complaint must provide only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "In other words, the plaintiff's complaint must be sufficient to provide the defendant with 'fair notice' of the plaintiff's claim and its basis." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (*citing Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

The hostile-work-environment claim was properly raised in the complaint. Although the complaint does not use the words "hostile work environment," it repeat-

edly alleges that Dr. Jajeh was subject to severe harassment because of his religion and national origin in violation of Title VII. The complaint also details how the harassment altered the conditions of Dr. Jajeh's employment, as well as Cook County's failure to take remedial action in response to the alleged harassment. Cook County had fair notice of the hostile-work-environment claim; Dr. Jajeh was "not required to plead with precision legal theories or detailed facts." *Benuzzi v. Bd. of Educ. of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011). And the district court also believed the issue was properly raised, otherwise it would not have reached the merits of the claim. *Cf. Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (district court properly denied plaintiff's attempt to amend complaint in his response to defendant's motion for summary judgment).

Turning to the merits of the claim, the district court found no evidence that the harassment Dr. Jajeh suffered was due to his religion or national origin. Rather, the evidence in the record demonstrated only that Dr. Jajeh had a personality conflict with Dr. Catchatourian. Key to this determination was the district court's exclusion of a declaration submitted by Dr. Jajeh as Exhibit 1 with his response to Cook County's motion for summary judgment. In this declaration, Dr. Jajeh described Dr. Catchatourian's derogatory comments that lie at the heart of his hostile-work-environment claim.[2]

---

[2] Dr. Jajeh's declaration alleges that Dr. Catchatourian stated that he "needed to believe in Christ and that if [he] did not, [he]
(continued...)

The court excluded the declaration because it was un-sworn, and not subscribed "under penalty of perjury," as required by 28 U.S.C. § 1746.[3]

Dr. Jajeh argues that the district court erred by not considering the declaration because, in doing so, the court relied on our precedent holding that an unsworn declaration does not comply with (now former) Federal Rule of Civil Procedure 56(e). *E.g., DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 471 (7th Cir. 1990) (unsworn affidavit not subscribed under penalty of perjury was not within range of evidence that district court could consider); *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1255 n.13 (7th Cir. 1990) (unsworn affidavits not subscribed under penalty of perjury did not comply with Rule 56(e)). In 2010, Rule 56 was reorganized and altered. "Subdivision (c)(4) carries forward some of the

---

[2] (...continued)
would not go to Heaven;" told him that the countries of the Middle East needed to be eliminated because "they were all terrorists;" and insisted that staff members engage in prayer with her.

[3] Section 1746 provides that "[w]herever, under any law of the United States or under any rule, regulation, order, or require-ment made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration . . . in writing of the person making the same . . . such matter may, with like force and effect, be sup-ported, evidenced, established, or proved by the unsworn declaration" of such person if made "under penalty of perjury" and verified as "true and correct."

provisions of former subdivision (e)(1). Other provisions are relocated or omitted." Fed. R. Civ. P. 56, advisory committee's note (2010 amends.). Rule 56(c)(4) no longer requires a formal affidavit to be submitted, but instead allows a declaration to be used to oppose a motion for summary judgment, so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Dr. Jajeh contends that his unsworn declaration complies with subdivision (c)(4), even if it would not have complied with former Rule 56(e) and does not comply with 28 U.S.C. § 1746.

Although we have not had occasion to address this issue, we need not decide whether Dr. Jajeh's declaration complies with Rule 56(c)(4);[4] "we may affirm on

---

[4] In *Phillis v. Harrisburg School District*, the Third Circuit briefly addressed whether an unsworn declaration that does not comply with § 1746 may be considered by a district court, albeit in an unpublished opinion and without analysis. 430 F. App'x 118 (3d Cir. 2011). Although citing to Rule 56(c), the court relied on precedent applying former Rule 56(e) to hold that the district court was free to disregard such a declaration. *Id.* at 122. *But see Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) (Kozinski, C.J., dissenting) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial."). District courts addressing the issue have continued to require that unsworn declarations

(continued...)

any ground supported in the record." *Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 456 (7th Cir. 2011). Even assuming that the declaration was properly before the district court, the grant of summary judgment was nevertheless correct because there is no basis for employer liability.

Whether there is a basis for employer liability depends on whether the alleged harassment was perpetrated by a supervisor or a coworker. *Vance*, 646 F.3d at 469. An employer may be strictly liable for harassment by supervisors, but a negligence standard applies for harassment by coworkers. *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006). " '[S]upervisor' is a term of art that denotes more than an individual with a higher rank, a superior title, or some oversight duties." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). Rather, a "supervisor" for purposes of Title VII must have "the power to directly affect the terms and conditions of the plaintiff's employment." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008). Thus, a supervisor will generally have "the authority to hire, fire, promote, demote, discipline or transfer" a plaintiff. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004).

---

[4] (...continued)

comply with § 1746 in order to be used to support or oppose a motion for summary judgment. *See, e.g.*, *Cunningham v. Windriver Mgmt. Grp.*, No. 3:10-cv-00358, 2011 WL 4449657, at *5 (M.D. Tenn. Sept. 26, 2011); *Monahan v. NRA Grp.*, No. 3:10-CV-00638, 2011 WL 3901877, at *2 n.5 (D. Conn. Sept. 6, 2011).

Dr. Jajeh attempts to characterize Dr. Catchatourian as a supervisor, noting that she had the authority to assign interns, residents, and fellows to herself and other physicians in the department. But this power only demonstrates that Dr. Catchatourian may have been a supervisor of the interns, residents, and fellows—not that she was Dr. Jajeh's supervisor. Dr. Catchatourian did not have the authority to hire, fire, promote, demote, discipline, or transfer Dr. Jajeh—even if she had that same authority with respect to others. Moreover, Dr. Jajeh even tacitly acknowledged that Dr. Catchatourian was not his supervisor, stating that they were "on the same level; we share the same responsibility." (Jajeh Dep. at 89.) Thus, Dr. Catchatourian and Dr. Jajeh were coworkers.

Because Dr. Catchatourian was a coworker, Dr. Jajeh must set forth sufficient facts to establish that Cook County was negligent in either discovering or remedying the harassment. *Vance*, 646 F.3d at 470. "Generally, we do not consider an employer to be apprised of the harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Rhodes*, 359 F.3d at 506 (internal quotation marks omitted). Once an employer is aware of workplace harassment, it can avoid liability by taking "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Vance*, 646 F.3d at 471.

Dr. Jajeh makes no claim that Cook County had constructive notice of the alleged harassment; therefore, the relevant inquiry is whether Dr. Jajeh's complaints gave

Cook County enough information "to make a reasonable employer think there was some probability" that he was being harassed on the basis of his religion or national origin. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 550 (7th Cir. 2011) (citation omitted). Although Dr. Jajeh's letters to Drs. Lad and Benson state that he was being discriminated against by Dr. Catchatourian, the letters in their *entirety* only vaguely complain about the personality issues he had with her. "Title VII does not prohibit all verbal or physical harassment in the workplace," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); it is directed only at "discriminat[ion] . . . because of . . . religion . . . or national origin," 42 U.S.C. § 2000e-2(a)(1).

Should Dr. Lad or any other supervisor have concluded that Dr. Catchatourian was "overflowing her clinic with patients" or "creating an atmosphere of confusion and chaos" because she harbored a forbidden animus? We think not; Dr. Jajeh's letters do not even hint that the cause of his complaints is related to his religion or national origin. A reasonable employer, therefore, would not believe there was any probability that Dr. Jajeh was being harassed on this basis. *See Yancick*, 653 F.3d at 550 ("[V]ague complaints unrelated to racial hostility are insufficient to establish employer liability."); *Montgomery*, 626 F.3d at 391-92 (complaints of general unfairness do not provide notice of racial harassment).

It is only upon filing a charge of discrimination with the EEOC on October 30, 2006, that Dr. Jajeh alleged

discrimination on the basis of religion and national origin. After this date, Cook County was apprised of the harassment. But there is also no evidence in the record that any alleged harassment continued after this date. Thus, the district court's grant of summary judgment was proper because there is no basis for employer liability.

## B. Retaliation

Dr. Jajeh also claims the district court erred in granting summary judgment for his retaliation claim. A plaintiff may proceed under the direct or indirect method to prove a claim of retaliation in violation of Title VII. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Dr. Jajeh opts for both methods, so we will discuss each in turn.

### 1. Direct Method

To satisfy the direct method of proof, Dr. Jajeh must show: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action at the hands of Cook County; and (3) there was a causal link between the two. *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 441 (7th Cir. 2010). The first two elements are uncontested—Dr. Jajeh's EEOC complaint is a statutorily protected expression, and he suffered an adverse action

when he was laid off by Cook County.[5] Therefore, the issue before us is whether there was a causal link between the two.

The causal nexus referenced in the third element may be met through either direct evidence (essentially Cook County admitting it fired Dr. Jajeh because he complained to the EEOC) or through a "convincing mosaic of circumstantial evidence" permitting that same inference. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Dr. Jajeh has no direct evidence, but argues that he has sufficient circumstantial evidence to satisfy the direct method. There are three categories of circumstantial evidence under the "convincing mosaic" approach: (1) suspicious timing, ambiguous statements

---

[5] Dr. Jajeh contends that the adverse actions he suffered prior to his EEOC complaint should also be taken into account, such as "being humiliated and isolated by not having residents and fellows assigned to him," "being accused of job abandonment," and "having sick days wrongfully assessed against him." (Appellant's Br. at 34.) He claims to have suffered these actions in retaliation for his internal complaints to Dr. Lad. But as we already discussed, Dr. Jajeh's earlier letters only vaguely complain about his work environment. And because they are only vague complaints unrelated to his religion or national origin, the earlier complaints are not statutorily protected. *See Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) ("Merely complaining in general terms of harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to constitute protected expression.) (internal punctuation and citation omitted).

and other bits and pieces from which an inference of retaliatory intent might be drawn; (2) evidence that similarly situated employees were treated differently; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Coleman*, 667 F.3d at 860.

The district court found that the timing of Dr. Jajeh's termination was not suspicious because he was laid off in April 2007—over five months after he last complained of discrimination, and at the same time that 200 other physicians were laid off due to budget cuts. The district court then concluded that Dr. Jajeh lacked any evidence of a causal connection between his termination and the EEOC complaint.

Dr. Jajeh first argues that the district court erred by relying too heavily on the amount of time that passed between his EEOC complaint and his eventual termination to find a lack of a causal link between the two events. Rather, he contends that Dr. Lad was merely biding his time and waiting for a plausible excuse to fire Dr. Jajeh. The mass layoffs conducted by Cook County presented such an opportunity. But contrary to Dr. Jajeh's argument, the district court did not rely on the timing of events to find that Dr. Jajeh did not satisfy the direct method. The court only noted that the timing of the layoff was not suspicious and did not, in itself, support a causal connection.

Dr. Jajeh next points to Dr. Lad's written statements as circumstantial evidence from which retaliatory intent can be drawn. Specifically, in his letter to Dr. Reilly,

Dr. Lad stated that the suspension of Dr. Jajeh's credentials was "an opportunity to solve a problem that has been going on ever since [Dr. Lad arrived at the hospital]." Dr. Jajeh argues that this reveals a retaliatory animus and that Dr. Lad was waiting for an opportunity to fire him. Moreover, Dr. Jajeh notes that Dr. Lad took action to prevent him from being rehired. Generally, a laid-off physician is placed on a list for preferential rehiring. Dr. Jajeh was not selected for preferential rehiring, however, because Dr. Lad wrote on Dr. Jajeh's personnel record that he was "not a team player [and has] difficulties with interpersonal relationships." Because budget cuts were the stated reason for his termination, and not difficulties with interpersonal relationships, Dr. Jajeh concludes this is also evidence of pretext.

Dr. Jajeh's argument falters for several reasons. First, the letter from Dr. Lad to Dr. Reilly was written prior to Dr. Jajeh's EEOC complaint, and therefore before any statutorily protected expression. Moreover, although the letter permits the inference that Dr. Lad wanted Dr. Jajeh fired, it does not allow any inference as to *why* he wanted Dr. Jajeh fired. Again, it was written prior to Dr. Jajeh's EEOC complaint, so one reason we know that Dr. Lad did *not* want him fired was to retaliate against him for filing the complaint. Dr. Jajeh's evidence also focuses heavily on actions taken by Dr. Lad—but Dr. Lad had no say in determining which physician would be laid off as part of the budget cuts. To prevail on his retaliation claim, Dr. Jajeh must prove that the decisionmaker (i.e., "the person responsible for the contested decision") has acted for a prohibited reason.

*Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011).

Dr. Jajeh attempts to circumvent this latter problem by advancing a "cat's paw" theory of liability, where a biased supervisor (in this case, Dr. Lad) uses an impartial decisionmaker to achieve retaliatory ends. *See generally Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). The relevant decisionmaker, according to Dr. Jajeh, was Dr. Reilly because he decided that a physician would be laid off from the Hematology/Oncology Department, determined which three evaluators would conduct the interviews, and was one of those three evaluators.[6]

Dr. Jajeh contends that Dr. Lad's retaliatory animus influenced Dr. Reilly and caused his termination for two reasons. First, Dr. Reilly was the recipient of Dr. Lad's letter, and therefore knew that Dr. Lad wanted Dr. Jajeh fired. This knowledge, according to Dr. Jajeh, prompted Dr. Reilly to select the Hematology/Oncology Department for a layoff. But this argument is illogical. Again, the 2005 letter was written prior to Dr. Jajeh's EEOC complaint, so even if Dr. Lad's "animus" influenced

---

[6] The district court found that Dr. Simon, Interim Chief of the Bureau of Health, was the relevant decisionmaker because he ultimately approved the layoffs. But Dr. Jajeh argues that Dr. Simon was nothing more than a rubber stamp who approved all layoffs submitted by his subordinates. Because we draw all reasonable inferences in Dr. Jajeh's favor, we assume that Dr. Jajeh is correct in this regard.

Dr. Reilly, it was not a retaliatory animus and therefore not prohibited by Title VII. Moreover, Dr. Reilly initially resisted any layoffs in the Hematology/Oncology Department, which belies any claim that he purposefully targeted the department in order to terminate Dr. Jajeh. It was only upon Dr. Simon's insistence on further layoffs that Dr. Reilly selected the Hematology/ Oncology Department. Finally, Dr. Reilly was one of three evaluators applying a uniform set of standards to determine which of the three physicians in the department would be laid off. He had no way of knowing that Dr. Jajeh, rather than one of the other two physicians, would be selected for termination. It is therefore highly improbable that he selected the Hematology/Oncology Department for a reduction with the intent that Dr. Jajeh be terminated.

Second, Dr. Jajeh points to the administrative hearing initiated by Dr. Lad which, Dr. Jajeh posits, was carried out in retaliation for his numerous complaints. Dr. Reilly later used this administrative hearing as a negative performance review to deduct points from Dr. Jajeh's score in his evaluation. And because Dr. Jajeh received a lower score than the two other physicians in his department, he was fired. Thus, Dr. Lad's retaliatory animus, according to Dr. Jajeh, was the cause of his discharge.

We disagree. Under the "cat's paw" theory of liability, "an employer may be liable . . . if a nondecision-maker performs an act motivated by [retaliatory] animus that is intended to cause an adverse employment action, and that act is a *proximate cause* of the ultimate employment

action." *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 448 (7th Cir. 2012) (emphasis added) (internal quotation marks and punctuation omitted) (*quoting Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011)). Even if Dr. Jajeh had no points deducted for his negative performance review, he nevertheless would have scored lower than Drs. Catchatourian and Telfer because they each received higher scores for having a specialty position.[7] The administrative hearing, therefore, was not a proximate cause of his termination. In any event, the administrative hearing also occurred prior to Dr. Jajeh's EEOC complaint—so it was not initiated in retaliation for any statutorily protected activity.

Dr. Jajeh lastly points to two additional facts as circumstantial evidence in the form of pretext. First, immediately after he was laid off, Dr. Telfer went from a part-time to full-time employee. Such a move could, conceivably, support an inference of pretext in some cases. *Cf. Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997) (in age-discrimination case, younger employee's promotion from part-time to full-time employee immediately after employer fired plaintiff was sufficient to establish that younger employee replaced plaintiff).

But here, Cook County's stated reason for terminating Dr. Jajeh was to reduce budget costs. And the County

---

[7] Dr. Jajeh would have scored 1,312 without the negative performance review, while Drs. Catchatourian and Telfer scored 1,640 and 1,400, respectively.

did in fact reduce budget costs by eliminating Dr. Jajeh's position and promoting Dr. Telfer—the County went from having two full-time employees and one part-time employee, to only two full-time employees. "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 743-44 (7th Cir. 2011) (internal quotation marks and punctuation omitted). Dr. Jajeh cannot demonstrate that Cook County's articulated reason for his termination was a lie, and therefore Dr. Telfer's promotion does not support an inference of pretext.

Second, Dr. Jajeh argues that Cook County did not follow its own procedures and policies by using employee evaluations, rather than seniority, to determine which physicians to lay off. If seniority had been used as a determining factor, then Dr. Jajeh would have been retained. Again, Dr. Jajeh is correct in noting that "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005). But as the district court aptly stated, "[T]he decision not to use seniority as the primary consideration was one that affected all employees." *Jajeh v. Cnty. of Cook*, No. 09-cv-7227, 2011 WL 1838758, at *6 (N.D. Ill. May 12, 2011). It is highly speculative for Dr. Jajeh to assert that seniority was not given determinative effect so that he would be selected for termination, when 200 other physicians were also laid off using the same criteria, and he offers no evidence in support of this bold assertion.

Because Dr. Jajeh has not presented sufficient circumstantial evidence of a causal link between his EEOC complaint and his termination, he cannot satisfy the direct method.

*2. Indirect Method*

Dr. Jajeh next argues that he has sufficient evidence to satisfy the indirect method of proving his retaliation claim. The first two elements of the indirect and direct methods of proof are the same, but the third element differs. Instead of proving a direct causal link, a plaintiff proceeding under the indirect method "must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination." *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 431 (7th Cir. 2010).

The indirect method employs the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If Dr. Jajeh succeeds in establishing a prima facie case, Cook County then must offer a legitimate, nondiscriminatory explanation for the decision to discharge him, *O'Leary*, 657 F.3d at 635—which in this case is the county-wide budget cuts. The burden of production then shifts back to Dr. Jajeh to show that the articulated reason for his discharge was pretextual. *Id.* The district court assumed without deciding that Dr. Jajeh could establish a prima facie case, but held there was no evidence suggesting pretext. Like the district court, we too focus on the question of pretext.

*See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012) ("Although the question of pretext normally arises only after the plaintiff has established a *prima facie* case . . . we may skip over the initial burden-shifting of the indirect method and focus on the question of pretext.").

We need not spend much time dispensing with Dr. Jajeh's argument. Dr. Jajeh presents the same evidence of pretext under the indirect method as in the direct method. *See Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003) (pretext category of circumstantial evidence under the direct method is substantially the same as the evidence required under the indirect method). And as we noted in our direct-method analysis, Dr. Jajeh has not presented sufficient evidence to establish that Cook County's budget cuts were pretextual. Thus, Dr. Jajeh cannot satisfy the indirect method of proving retaliation.

*3. Post-Termination Retaliation*

Although Dr. Jajeh's retaliation claim focuses heavily on his termination, he also argues that Dr. Lad retaliated against him following his termination. As previously discussed, Dr. Lad noted in Dr. Jajeh's personnel record that he would not recommend Dr. Jajeh for rehire because he was "not a team player [and has] difficulties with interpersonal relationships." Dr. Jajeh contends that this notation was itself a distinct and actionable act of retaliation because it prevented his rehire. The district court did not directly address this argument, but post-

termination acts of retaliation may be actionable under Title VII. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) (allowing claim for bad reference to prospective employer in retaliation for filing EEOC charge).

Nevertheless, we are unpersuaded. There is simply no evidence in the record from which a reasonable jury could conclude that Dr. Lad was motivated by a retaliatory animus when marking Dr. Jajeh as ineligible for rehire. As Dr. Jajeh acknowledges, Dr. Lad's feelings about him were consistent throughout their working relationship. Dr. Lad felt that Dr. Jajeh was a problem employee both before and after he filed his EEOC charge. No evidence supports the inference that Dr. Lad's opinion of Dr. Jajeh worsened because he filed an EEOC charge or that his explanation that Dr. Jajeh was "not a team player" was pretext for a retaliatory motive. *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 684-85 (7th Cir. 2007) (affirming summary judgment for employer on retaliation claim where performance reviews were negative both before and after protected conduct of filing EEOC charge). Accordingly, summary judgment was also appropriate for this claim.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.